**Slip Op. 05-22**

UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| SHANGHAI TAOEN INTERNATIONAL TRADING CO., LTD., | : |
| Plaintiff, | : |
| v. | : Court No. 04-00125 |
| UNITED STATES, | : **Public Version** |
| Defendant, | : |

[Commerce Department Antidumping Determination Sustained]

Dated: February 17, 2005

Lee & Xiao (Yingchao Xiao, Bub-Joo S. Lee, and Jay J. Chung) for plaintiff.

Peter D. Keisler, Assistant Attorney General, David M. Cohen, Director, Commercial Litigation Branch, Civil Division, United States Department of Justice, Jeanne E. Davidson, Deputy Director, Commercial Litigation Branch, Civil Division, United States Department of Justice, (David S. Silverbrand), Linda S. Chang, Office of the Chief Counsel for Import Administration, United States Department of Commerce, of counsel, for defendant.

**OPINION**

**RESTANI, Chief Judge:**

Plaintiff Shanghai Taoen International Trading Co. ("Taoen") appears before the court on a motion for judgment upon the agency record pursuant to USCIT Rule 56.2, challenging the determination issued by the United States Department of Commerce ("Commerce") in the antidumping duty administrative review of freshwater crawfish tail meat ("crawfish tail meat") from the People's Republic of China ("PRC") for the period of review September 1, 2001

through August 31, 2002 (the "POR").

## JURISDICTION AND STANDARD OF REVIEW

The court has jurisdiction pursuant to 28 U.S.C. § 1581(c) (2000). In accordance with 19

U.S.C. § 1516a(b)(1)(B) (2000), the court shall hold unlawful any determination "unsupported by

substantial evidence on the record, or otherwise not in accordance with law."

## FACTUAL AND PROCEDURAL BACKGROUND

On August 1, 1997, Commerce published in the Federal Register the final determination

of its sales-at-less-than-fair-value ("LTFV") investigation of crawfish tail meat from the PRC,

covering the period March 1, 1996 through August 31, 1996. Freshwater Crawfish Tail Meat

From the People's Republic of China, 62 Fed. Reg. 41,347 (Dep't Commerce August 1, 1997)

(amended by Freshwater Crawfish Tail Meat from the People's Republic of China, 62 Fed. Reg.

48,218 (Dep't Commerce Sept. 15, 1997)). Based on timely requests from interested parties

pursuant to 19 CFR 351.213(b) (2002), Commerce initiated an administrative review of the

antidumping duty order on crawfish tail meat from the PRC for the POR, including the initiation

of a review of Taoen's exports of crawfish tail meat. Initiation of Antidumping and

Countervailing Duty Administrative Reviews, 67 Fed. Reg. 65,336 (Dep't Commerce Oct. 24,

2002).

In its initial questionnaire response, Taoen stated that it did not produce any of the

crawfish tail meat that it exported during the POR. Questionnaire Response (Dec. 10, 2002), at

3, Pl.'s App., Tab A. Instead, Taoen indicated that all of the crawfish tail meat was produced by

Lianyungang Yuzhu Aquatic Products Processing Co. ("Yuzhu"). Id. at 5, Pl.'s App., Tab A.

On January 23, 2003, Commerce requested more information about Taoen's producers, to which

Taoen affirmed that Yuzhu was the only company that supplied Taoen with crawfish tail meat. Questionnaire Response (March 7, 2003), at 22, Pl.'s App., Tab C.  Subsequently, Commerce issued a supplemental questionnaire on May 2, 2003, in which it requested that Taoen provide all information as to "Shanghai Taoen's and Yuzhu's relationship(s) with any entities or individuals in any way involved in the production, processing, exportation, shipment, importation, distribution, or sale of crawfish tail meat." Questionnaire Response (May 15, 2003), at 45, Pl.'s App., Tab E.  Taoen replied that "Shanghai Taoen and Yuzhu have no relationship with any entities or individuals in any way involved in the production, processing, exportation, shipment, importation, distribution, or sale of crawfish tail meat." Id. at 45, Pl.'s App., Tab E.

For the purpose of its preliminary results, Commerce relied on these responses, and calculated a preliminary margin of 57.73%, based on factors of production for Taoen's one reported producer, Yuzhu.  Freshwater Crawfish Tail Meat from the People's Republic of China, 68 Fed. Reg. 58,064 (Dep't Commerce October 8, 2003) (preliminary results).  During Commerce's verification research, the U.S. Customs and Border Protection ("Customs") provided Commerce with copies of all entry documents related to Taoen's sales of crawfish tail meat during the POR.  Commerce determined that Taoen's questionnaire responses were inconsistent with Customs' entry documents.[1] Supplemental Request for Information (Dec. 5,

---

[1] The entry documents provided by Customs included the [
                                                                  ] for each of Taoen's U.S. sales.
Supplemental Request for Information (Dec. 5, 2003), at 109, Pl.'s App., Tab J.  For [
                                                                  ] produced the subject
merchandise that Taoen exported to the United States.  Id. at 109, Pl.'s App., Tab J.  [

(continued...)

2003), at 109, Pl.'s App., Tab J.  On December 5, 2003, Commerce alerted Taoen to these

inconsistencies and asked it to explain and provide documentation demonstrating that Yuzhu was

the only producer of Taoen's crawfish tail meat.  Id. at 110, Pl.'s App., Tab J.  In its December

15, 2003 response, Taoen reiterated that Yuzhu was the only producer of the crawfish tail meat

and explained that the inconsistency was caused by a backlog for receiving inspection results in

Lianyungang.[2]  Response to the Department's Dec. 5, 2003 Letter (Dec. 15, 2003), at 113, Pl.'s

App., Tab K.

On February 13, 2004, Commerce released its administrative determination and

accompanying issues and decisions memorandum, in which it determined that Taoen's

explanation for the inconsistencies between its questionnaire responses and Customs' entry

documents was not credible,[3] and even if it was, Taoen withheld information from Commerce

---

[1](...continued)

] Id. at 109, Pl.'s App., Tab J.  For the [

] Id. at 109, Pl's App., Tab
J.

[2] Taoen explained that goods were shipped directly to the United States from Yuzhu's
factory, so Yuzhu was responsible for the merchandise to [                                        ].
Response to the Department's Dec. 5, 2003 Letter at 113, Pl.'s App., Tab K.  Taoen claims that
the reason that [                                                                      ] was because
[              ] in Lianyungang had too many shipments submitted for inspection.  Id. at 113, Pl.'s
App., Tab K.  In order to ship out the goods on time, Yuzhu [
                                        ].  Id. at 113, Pl's App., Tab K.  As
support for this explanation, Taoen attached [

].  Id. at 113, Pl.'s App., Tab K.

[3]Taoen claims that Yuzhu [
        ].  In support of this claim, Taoen points to receipts for payments by Yuzhu,
                                                                           (continued...)

throughout the administrative review.  Id. at 162, Pl's App., Tab M.  To determine the appropriate margin, Commerce applied total facts available pursuant to 19 U.S.C. § 1677e(a), and concluded that an adverse inference was warranted pursuant to 19 U.S.C. § 1677e(b).  Id. at 162, 164, Pl.'s App., Tab M.  As the total adverse facts available rate, Commerce assigned the highest margin from any segment of the proceeding.  Id. at 164–65, Pl.'s App., Tab M.  This resulted in Taoen being assigned a rate of 223.01%–a rate calculated in the 1999–2000 administrative review of the antidumping duty order on crawfish tail meat from the PRC, for the exporter Huaiyin 30.  Id. at 164–65, Pl.'s App., Tab M.

On appeal to this court, Taoen challenges Commerce's (1) decision to apply total adverse facts available to determine its antidumping duty margin, and (2) assignment of the highest margin from any segment of the proceeding as the total adverse facts available rate.

## DISCUSSION

I.      **Commerce's Application of Total Adverse Facts Available is Supported by Substantial Evidence and is Otherwise in Accordance with the Law.**

Taoen contests the application of total adverse facts available to determine its dumping margin, arguing that (1) Taoen did not withhold information, (2) even if information was initially withheld, it was supplied within the relevant deadlines, and (3) any information not submitted was neither significant nor fundamental to Commerce's calculation of an accurate dumping

---

[3](...continued)
however, in each instance, [
                                                  ].  Commerce determined that it was not credible that [
                                                                                                    ].  Freshwater
Crawfish Tailmeat From the People's Republic of China (Feb. 5, 2004), at 162, Pl.'s App., Tab
M ("Feb. 5, 2004 Memorandum").

margin. Taoen contends that it initially misunderstood Commerce's questions about its business

relationships, and that it accurately answered Commerce's questions about its producer

relationships at every stage of Commerce's review. Taoen asserts that before Commerce applies

facts otherwise available, 19 U.S.C. § 1677m(d) requires that Commerce provide Taoen with an

opportunity to remedy or explain deficiencies in its submission.[4]

Commerce provided an opportunity to explain in its December 5, 2003, questionnaire,

and Taoen contends that it responded with credible information showing that the inconsistencies

between its questionnaire responses and Customs' entry documents merely reflect undisclosed,

insubstantial business relationships that would have had little bearing on the calculation of

Taoen's antidumping margin.[5] Therefore, Taoen argues that, even if its initial failure to respond

---

[4] The application of facts otherwise available is subject to the limitations of 19 U.S.C. § 1677m(d), which provides in relevant part,

> If the administering authority or the Commission determines that a response to a request for information under this subtitle does not comply with the request, the administering authority or the Commission (as the case may be) shall promptly inform the person submitting the response of the nature of the deficiency and shall, to the extent practicable, provide that person with an opportunity to remedy or explain the deficiency in light of the time limits established for the completion of investigations or reviews under this subtitle.

19 U.S.C. § 1677m(d).

Commerce responds that facts otherwise available is applicable because Taoen withheld business relationship information until Commerce discovered the inconsistencies through verification. Here, Taoen and Yuzhu could have reported their business relationships with [

]. Commerce asserts that Taoen's explanation, at the very least, indicates that it willfully ignored the plain meaning of Commerce's questions and overreached in providing answers to those questions.

[5] Taoen explains that during the POR it sometimes took weeks to obtain inspection

(continued...)

warrants the application of facts otherwise available, 19 U.S.C. § 1677m(e) requires Commerce

to apply partial facts available regarding the specific information that Taoen allegedly failed to

report.[6]  Moreover, Taoen argues that Commerce failed to adequately explain its rationale for

using an adverse inference in selecting among facts otherwise available.

Pursuant to 19 U.S.C. § 1677e(a), Commerce may use facts otherwise available to

determine an antidumping duty if,

---

[5](...continued)
results from [                    ] in Lianyungang.  The reason [
                                        ], was that in order to ship the goods on time, Yuzhu [
                                                                                     ].  As
evidence of this arrangement, Taoen submitted [

                    ].  If Taoen's explanation is credible, [
                                                        ], and the absence of information
regarding these business relationships is not clearly significant to calculating Taoen's dumping
margin.

[6] The statutory scheme clearly provides Commerce with wide discretion to disregard
information that is not deemed credible.  The statute specifies, if the respondent "submits further
information in response to such deficiency and either (1) the administering authority or the
Commission (as the case may be) finds that such response is not satisfactory, or (2) such
response is not submitted within the applicable time limits, then . . . Commerce may disregard all
or part of the original and subsequent responses."  19 U.S.C. § 1677m(d).  Commerce may not,
however, decline to consider necessary information submitted by an interested party if,

> (1) the information is submitted by the deadline established for its submission,
> (2) the information can be verified,
> (3) the information is not so incomplete that it cannot serve as a reliable basis for
> reaching the applicable determination,
> (4) the interested party has demonstrated that it acted to the best of its ability in
> providing the information and meeting the requirements established by the
> administering authority or the Commission with respect to the information, and
> (5) the information can be used without undue difficulties.

19 U.S.C. § 1677m(e).  In these cases, Commerce must utilize the information provided and fill
in the gaps with partial facts available.

(1) necessary information is not available on the record, or

(2) an interested party or any other person –

> (A) withholds information that has been requested by the administering authority or the Commission under this subtitle,
> (B) fails to provide such information by the deadlines for submission of the information or in the form and manner requested,
> (C) significantly impedes a proceeding under this subtitle, or
> (D) provides such information but the information cannot be verified as provided as provided in section 1677m(i) of this title.

19 U.S.C. § 1677e(a). If the use of facts otherwise available is warranted, Commerce may draw adverse inferences in selecting among such facts:

> If the administering authority . . . finds that an interested party has failed to cooperate by not acting to the best of its ability to comply with a request for information from the administering authority . . . , the administering authority . . . , in reaching the applicable determination under this subtitle, may use an inference that is adverse to the interests of that party in selecting from among the facts otherwise available.

19 U.S.C. § 1677e(b). The statute does not provide an express definition of "the best of its ability," although the Federal Circuit has determined that "the statutory mandate that a respondent act to 'the best of its ability' requires the respondent to do the maximum it is able to do." Nippon Steel Corp. v. United States, 337 F.3d 1373, 1382 (Fed. Cir. 2003). To meet this standard, Commerce "needs to articulate why it concluded that a party failed to act to the best of its ability, and explain why the absence of this information is of significance. . . ." Mannesmannrohen-Werke AG v. United States, 23 CIT 826, 839, 77 F. Supp. 2d 1302, 1313–14 (1999).

In the instant case, Commerce made extensive efforts to request complete responses regarding all of Taoen's producer and business relationships. See supra pp. 2-4. In response to each of Commerce's inquiries, Taoen responded that its sole producer was Yuzhu. Commerce

relied on Taoen's responses to calculate an antidumping margin based on factors of production for the only disclosed producer of Taoen's exports of the crawfish tail meat. Through Commerce's own efforts, it discovered substantial, previously unreported evidence of additional business relationships in entry documents provided by Customs, and raised verification questions about those relationships. In response to Commerce's final questionnaire, Taoen provided an explanation for the inconsistencies between the entry records and its previous questionnaire responses and attempted to cure the deficiencies in its prior answers. Commerce argues that Taoen's explanation is not credible, and even if it is credible, Taoen purposefully withheld fundamental information until Commerce's verification discovery. Therefore, Commerce asserts that application of total adverse facts available to determine Taoen's antidumping margin is based on substantial evidence.

The court agrees with Commerce that Taoen has failed to provide a satisfactory explanation for the inconsistencies between its questionnaire responses and the entry documents provided by Customs.[7] The court has several bases for its decision. First, the entry documents themselves establish a presumption that Taoen's questionnaire responses were inaccurate because they show that Taoen failed to provide Commerce with complete information. Second, it was appropriate for Commerce to skeptically consider Taoen's explanation because it was only provided after Commerce discovered the entry document inconsistencies, through its own investigation. Third, Commerce cited ample evidence in support of its conclusion that Taoen's

---

[7] Since the court finds that Taoen failed to provide a credible explanation for the inconsistencies between its questionnaire responses and Customs' entry documents, it is unnecessary for the court to address whether Taoen's initial failure to disclose its business relationships is sufficient to support Commerce's application of total adverse facts available.

explanation does not make "economic or logistical sense."[8]  Finally, Taoen failed to provide a

complete explanation for Customs' entry documents.[9]  In total, these findings amount to

substantial evidence that Taoen continues to withhold producer information necessary to

accurately calculate Taoen's antidumping margin.[10]

As the court sustains Commerce's determination that Taoen failed to provide accurate

producer information, Commerce was justified in applying total facts otherwise available under §

1677e.  Although separate determinations are required for application of facts otherwise available

under § 1677e(a), and adverse inferences under § 1677e(b), both standards are met where a

respondent purposefully withholds, and provides misleading, information.  Here, the discovery of

Customs' entry documents raised a presumption that Taoen failed to accurately respond to

Commerce's producer questions.  Thus, Commerce could reasonably infer from Taoen's

---

[8] The evidence includes the following: (1) if Taoen's explanation is accepted, Yuzhu [


                                                    ] prior to shipment to Taoen.  Producers [          ]
and [                 ] both are over [                                                                    ], where Yuzhu is
located; and (2) Taoen claims that Yuzhu [
                            ], and provides copies of receipts for payments made by Yuzhu [
                 ].  In each instance, however, Commerce concluded that [

              ].  It is not credible that [
       ].

[9] Taoen provided no evidence demonstrating that Yuzhu was the supplier for [
                                                                              ].

[10] There is no evidence to support Taoen's argument that it had no motivation to lie.
There is no evidence of the factors of production for other "suppliers".  Further, there may be
many explanations why a company must sometimes resort to higher cost suppliers.  The court
may not speculate about such matters.

subsequent failure to credibly explain the inconsistencies between its questionnaire responses and Customs' entry documents, that Taoen purposefully withheld producer information to avoid a higher dumping margin. Under such circumstances the adverse inference of lack of best efforts is warranted. Accordingly, Commerce's application of an adverse inference is based on substantial evidence and in accordance with the law.

## II.      Commerce's Decision to Apply the 223.01% Antidumping Margin is Supported by Substantial Evidence and Otherwise in Accordance with the Law

Taoen argues that Commerce's choice of a rate of 223.01% is impermissibly punitive and has no probative value. According to Taoen, it was punitive for Commerce to apply the highest rate determined in the current or any previous segment of the proceeding–a difference of 168.28% compared to the dumping margin of 57.73% calculated at the preliminary stage.[11] Instead, Taoen asserts that Commerce should have applied a partial facts available rate, and calculated the dumping margin based on the information submitted by Yuzhu, with the addition of extra transportation costs inadvertently not disclosed.

"Commerce has broad, but not unrestricted, discretion in determining what would be an accurate and reasonable dumping margin where a respondent has been found uncooperative."

---

[11] Taoen argues that the imposition of a rate that is 168.28% higher than the antidumping margin calculated in the preliminary stage is facially punitive. The court has suggested that the magnitude of a rate increase alone can indicate that Commerce's selection of an antidumping rate may have been punitive. Shandong Huarong Gen. Group Corp. v. United States, No. 01–00858, Slip Op. 04–117, at 14 n.9 (Ct. Int'l Trade Sept. 13, 2004) (finding a rate increase from 47.88% to 139.31% may have been punitive, although rejecting the rate on the grounds that it was aberrational). Here, Taoen's preliminary rate has been discredited by Customs' entry documents, whereas in Shandong the 47.88% rate was an alternative supported by competent evidence. The percentage increase over Taoen's discredited preliminary rate is not a valid measure of whether Taoen's new rate is punitive.

Reiner Brach GmbH & Co. v. United States, 206 F. Supp. 2d 1323, 1339 (Ct. Int'l Trade 2002).

In determining an adverse inference, Commerce may rely on information derived from "(1) the

petition, (2) a final determination in the investigation under this subtitle, (3) any previous review

under section 1675 of this title or determination under section 1675b of this title, or (4) any other

information placed on the record." 19 U.S.C. § 1677e(b). Commerce must not, however, impose

"punitive, aberrational, or uncorroborated margins." F. lli de Cecco di Filippo Fara S. Martino

S.p.A. v. United States, 216 F.3d 1027, 1032 (Fed. Cir. 2000). The Federal Circuit has

recognized that a rational relationship must exist between the margin chosen by Commerce and

the party to whom it is applied:

> It is clear from Congress's imposition of the corroboration requirement in 19
> U.S.C. § 1677e(c) that it intended for an adverse facts available rate to be a
> reasonably accurate estimate of the respondent's actual rate, albeit with some
> built-in increase intended as a deterrent to non-compliance. Congress could not
> have intended for Commerce's discretion to include the ability to select
> unreasonably high rates with no relationship to the respondent's actual dumping
> margin. Obviously a higher adverse margin creates a stronger deterrent, but
> Congress tempered deterrent value with the corroboration requirement. It could
> only have done so to prevent the petition rate (or other adverse inference rate),
> when unreasonable, from prevailing and to block any temptation by Commerce to
> overreach reality in seeking to maximize deterrence.

Ta Chen Stainless Steel Pipe, Inc. v. United States, 298 F.3d 1330, 1339–40 (Fed. Cir. 2002)

(citing de Cecco, 216 F.3d at 1032).

Nonetheless, both this court and the Federal Circuit have determined that in cases in

which the respondent fails to provide Commerce with information necessary to calculate an

accurate antidumping margin, "it is within Commerce's discretion to presume that the highest

prior margin reflects the current margins." Id. 298 F.3d at 1339 (citing Rhone Poulenc, Inc. v.

United States, 899 F.2d 1185, 1190 (Fed. Cir. 1990)); see also NSK Ltd. v. United States, 346 F.

Supp. 2d 1312, 1335 (Ct. Int'l Trade 2004) (upholding a 73.55% total adverse facts available rate, the highest available antidumping margin from a different respondent in an LTFV investigation); Kompass Food Trading Int'l v. United States, 24 CIT 678, 689 (2000) (upholding a 51.16% total adverse facts available rate, the highest available antidumping margin from a different, fully cooperative respondent in an LTFV investigation).  The purposes of using the highest prior antidumping duty rate are to offer assurance that the exporter will not benefit from refusing to provide information, and to produce an antidumping duty rate that bears some relationship to past practices in the industry in question.  D & L Supply Co. v. United States, 113 F.3d 1220, 1223 (Fed. Cir. 1997).  In choosing the appropriate balance between providing respondents with an incentive to respond accurately and imposing a rate that is reasonably related to the respondent's commercial activity, the highest prior margin presumption "reflects a common sense inference that the highest prior margin is the most probative evidence of current margins because, if it were not so, the importer, knowing of the rule, would have produced current information showing the margin to be less."  Rhone Poulenc, 899 F.2d at 1190.  Commerce must not, however, assume the highest previous margin applies simply because it is the one most prejudicial to the respondent.  Ferro Union, Inc. v. United States, 23 CIT 178, 205, 44 F. Supp. 2d 1310, 1335 (1999).

Here, Commerce assigned Taoen the 223.01% rate, stating that "[i]t is the Department's practice to assign the highest rate from any segment of a proceeding as total adverse facts available when a respondent fails to cooperate to the best of its ability."  Feb. 5, 2004 Memorandum at 164, Pl's App., Tab M (for support Commerce cited Certain Forged Stainless Steel Flanges From India, 67 Fed. Reg. 10,358 (Dep't Commerce March 7, 2002) (preliminary

results) (assigning a 210% rate to four uncooperative respondents, which represented the highest

margin from any segment of the proceeding)). Commerce examined the rate calculated for

Huaiyin 30 in the 1999–2000 review and determined that the rate is both reliable and relevant.

Commerce stated that the rate is relevant because it is "based on sales and production data of a

respondent in a prior review," it is "subject to comment from interested parties in the

proceeding," and there is "no information on the record of this review that demonstrates that this

rate is not appropriately used as adverse facts available." Feb. 5, 2004 Memorandum at 165–66,

Pl.'s App., Tab M.

The court has stated that "[i]n order to satisfy substantial evidence, Commerce must go

beyond simply stating that the [highest available rate] is 'reasonable' and has 'some basis in

reality.' Shandong, Slip. Op. at 16; see also Am. Silicon Techs. v. United States, 24 CIT 612,

626, 110 F. Supp. 2d 992, 1004 (2000) (rejecting a 93.20% surrogate margin because the only

reason Commerce gave for selecting the margin was that the rate would be sufficiently adverse to

induce full cooperation in future reviews). Commerce's burden is greater where information on

the record demonstrates that an alternative rate may be appropriate. See Shandong, Slip. Op. at

16 (requiring an explanation for Commerce's choice of the highest available antidumping margin

calculated for the companies in the prior administrative review);[12] Ferro Union, 23 CIT at

---

[12] In Shandong, the court rejected a 139.31% rate, assigned as the total adverse facts available rate for the respondents Huarong and LMC, using the highest available rate calculated in a preceding administrative review for another company under investigation. The court determined that Commerce failed to show how this rate bore a rational relationship to Huarong and LMC. First, Commerce used sales information for a different respondent in the previous administrative review even though actual sales information for both Huarong and LMC was available for that same review. Second, in the same administrative review Huarong and LMC

(continued...)

204–205, 44 F. Supp. 2d at 1335 (requiring an explanation for applying a margin calculated for another producer eight years prior to the period of review, in spite of the fact that Commerce had margins for respondents in prior administrative reviews). Where the highest available rate is the most probative rate on the record, Commerce's burden is satisfied. See Ta Chen, 298 F.3d at 1339 (upholding the use of the highest dumping margin, where the methodology chosen by Commerce was the only way to apply an adverse inference while still using respondent's own information); D & L Supply Co., 113 F.3d at 1223 ("While the highest prior margin is obviously not a precise indicator of current dumping practices, it provides at least some guidance as to the probable dumping margin in the period for which the exporter is not providing information, and it is preferable in that respect to an arbitrarily selected figure that has no pretension to accuracy."); Rhone Poulenc, 899 F.2d at 1190 (upholding the use of the highest prior margin where the respondent offered no evidence showing that recent margins were more probative of current conditions than the highest prior margin). Here, the court concludes that the 223.01% dumping margin is rationally related to Taoen because (1) the rate reflects recent commercial activity by a crawfish tail meat exporter from the PRC, and (2) Taoen's failure to accurately respond to Commerce's producer questions has resulted in an egregious lack of evidence on the record to suggest an alternative rate.

Unlike in Shandong and Ferro Union, Commerce had no probative alternatives to the

_____

[12](...continued)
had rates significantly lower than the 139.31% rate–Huarong's rate was 28.96% and LMC's rate was 29.10%. Finally, Commerce gave no explanation for why rates for Huarong and LMC increased so dramatically over rates calculated while Huarong and LMC were cooperating in the previous review.

highest available margin. This is the first administrative review of Taoen's exports of crawfish

tail meat, so there is no prior Taoen antidumping margin for Commerce to select. Moreover,

Taoen's preliminary margin of 57.73% was based on Yuzhu's factors of production; this rate has

no validity after Commerce's credibility conclusion. Taoen's only proposed alternative is a

partial facts available rate that would build on Taoen's preliminary 57.73% rate, with an upward

adjustment for Yuzhu's undisclosed transportation costs. This rate is inappropriate because the

underlying basis for the preliminary rate has been discredited.[13] Therefore, Taoen has failed to

provide, and the record fails to disclose, a justification for applying an antidumping margin that

falls below the 223.01% chosen by Commerce. Accordingly, Commerce's application of the

highest margin from any segment of the antidumping proceeding is based on substantial evidence

and otherwise in accordance with the law.

---

[13] Commerce's resort to total, as opposed to partial, facts available in determining the dumping margin for Taoen is appropriate given its credibility determination. "Generally, Commerce uses partial facts available only to fill 'gaps in the record due to deficient submissions or other causes.'" Am. Silicon Techs., 240 F. Supp. 2d at 1308 n.1 (quoting Statement of Administrative Action accompanying the Uruguay Round Agreements Act, H.R. Rep. No. 103-826, at 656, 869 (1994)). This is not a case of partial gaps in the record. Commerce determined that Taoen failed to provide a credible explanation for the inconsistencies between Customs' entry documents and Taoen's questionnaire responses which concerned the identity of suppliers. Such information is core, not tangential, and there is little room for substitution of partial facts. Total facts available is therefore appropriate because Commerce has no reliable factors of production information with which to calculate Taoen's antidumping margin. Whether another substitute margin would be more rationally related to the "actual" margin is not before the court because plaintiff has not suggested one, and one is not readily apparent in the record.

**CONCLUSION**

In light of the foregoing, the court finds that Commerce's application of the total adverse facts available rate of 223.01% is appropriate. Accordingly, plaintiff's motion for a judgment on the agency record is denied and judgment shall enter for defendant.


                                        /s/ Jane A. Restani
                                        Jane A. Restani
                                        CHIEF JUDGE

Dated:  New York, New York

        This 17th day of February, 2005.