Slip Op. 08-122

UNITED STATES COURT OF INTERNATIONAL TRADE

```
_____   :
                                      :
ASSOCIATION OF AMERICAN               :
SCHOOL PAPER SUPPLIERS,               :
                                      :
              Plaintiff,              :
                                      :
          v.                          :  Before: Richard K. Eaton, Judge
                                      :
UNITED STATES,                        :  Consol. Court No. 06-00395
                                      :
              Defendant,              :  Public Version
                                      :
      and                             :
                                      :
KEJRIWAL PAPER LIMITED,               :
                                      :
              Deft.-Int.              :
_____   :
                                      :
KEJRIWAL PAPER LIMITED,               :
                                      :
              Plaintiff,              :
                                      :
          v.                          :
                                      :
UNITED STATES,                        :
                                      :
              Defendant,              :
                                      :
      and                             :
                                      :
ASSOCIATION OF AMERICAN               :
SCHOOL PAPER SUPPLIERS,               :
                                      :
              Deft.-Int.              :
_____   :
```

OPINION AND ORDER

[United States Department of Commerce's final results of administrative review on certain lined paper products from India are sustained in part and remanded.]

Dated: November 17, 2008

*Wiley Rein LLP* (*Alan H. Price*, *Timothy C. Brightbill* and *Maureen E. Thorson*), for plaintiff/defendant-intervenor Association of American School Paper Suppliers.

*Gregory G. Katsas*, Assistant Attorney General; *Jeanne E. Davidson*, Director, *Patricia M. McCarthy*, Assistant Director, Commercial Litigation Branch, Civil Division, United States Department of Justice (*John J. Tudor*); Office of Chief Counsel for Import Administration, United States Department of Commerce (*Natasha Camille Robinson*), of counsel, for defendant United States.

*deKieffer & Horgan* (*J. Kevin Horgan* and *Gregory S. Menegaz*), for plaintiff/defendant-intervenor Kejriwal Paper Limited.

Eaton, Judge:  This consolidated action[1] is before the court on the motions of plaintiff/defendant-intervenor Association of American School Paper Suppliers (the "Association") and plaintiff/defendant-intervenor Kejriwal Paper Limited ("Kejriwal") for judgment upon the agency record pursuant to USCIT Rule 56.2, and defendant the United States' opposition thereto.  *See* Association's Mot. J. Agency R. ("Ass'n Br."); Brief. Supp. Mot. J. Agency R. Kejriwal ("Kejriwal's Br."); Def.'s Opp. Pls.' and Deft.-Ints.' Mots. J. Agency R. ("Def.'s Br.").

By their motions, the Association and Kejriwal each challenge certain aspects of the United States Department of Commerce's ("Commerce" or the "Department") final results in its

---

[1]  This action includes court numbers 06-00395 and 06-00399. *See Ass'n of Am. School Paper Suppliers v. United States*, Consol. Ct. No. 06-00395 (Feb. 26, 2007) (order granting consent motion to consolidate cases).

administrative review of certain lined paper products ("CLPP")
from India, covering the period of review ("POR") July 1, 2004,
through June 30, 2005.  *See* CLPP from India, 71 Fed. Reg. 45,012
(Dep't of Commerce Aug. 8, 2006) (notice of final determination
of sales at less than fair value) (the "Final Results").  The
Final Results expressly adopted the Issues and Decisions
Memorandum for the Final Determination in the Antidumping
Investigation of CLPP from India (Dep't of Commerce July 31,
2006) (the "I&D Memo").  Jurisdiction is had pursuant to 28
U.S.C. § 1581(c) (2000) and 19 U.S.C. § 1516a(a)(2)(B)(i).

For the reasons set forth below, Commerce's Final Results
are sustained in part and remanded.

BACKGROUND

In September 2005, the Association, an "*ad hoc* trade
organization" acting on behalf of the domestic paper industry,[2]
filed a petition with Commerce and the International Trade
Commission ("ITC") seeking the imposition of antidumping and
countervailing duties on imports of CLPP[3] from India.  *See* Ass'n

---

[2]  The Association consists of MeadWestvaco Corporation,
Norcom, Inc., and Top Flight, Inc.  Ass'n Br. 2.

[3]  CLPP refers to, and thus the scope of Commerce's
investigation included, "[paper] products . . . [such] as single-
and multi-subject notebooks, composition books, wireless
notebooks, looseleaf or glued filler paper, graph paper, and
laboratory notebooks . . . ."  CLPP From India, 71 Fed. Reg.
(continued...)

Br. 2.  In response, Commerce initiated an antidumping investigation in early October 2005.  CLPP From India, Indonesia, and the People's Republic of China, 70 Fed. Reg. 58,374 (Dep't of Commerce Oct. 6, 2005) (notice of initiation of antidumping duty investigations).

Commerce published its preliminary determination in April 2006.  *See* CLPP From India, 71 Fed. Reg. 19,706 (Dep't of Commerce Apr. 17, 2006) (notice of preliminary determination of sales at less than fair value) (the "Preliminary Determination"). The Preliminary Determination found that two of the three respondents in the investigation, Navneet Publications (India) Ltd. ("Navneet") and Aero Exports ("Aero"), provided incomplete information in their cost of production questionnaire responses and that the information in their responses could neither be verified nor reasonably relied upon to calculate dumping margins. *See id.* at 19,709.  As a result, the Department concluded that Navneet and Aero "impeded [Commerce's] investigation" and "failed to cooperate to the best of their ability."  *Id.* at 19,709-10. Based upon these findings, Commerce assigned Navneet and Aero each an adverse facts available[4] ("AFA") dumping rate of 110.43

---

[3](...continued)
19,706, 19,707 (Dep't of Commerce Apr. 17, 2006) (notice of preliminary determination of sales at less than fair value) (footnotes omitted).

[4]  Pursuant to 19 U.S.C. § 1677e(a), if:
                                           (continued...)

percent.  *See id.*  This rate was the highest transaction-specific

margin found in the proceeding, i.e., a rate from a single

Kejriwal transaction.  *Id.*

Shortly after it issued the Preliminary Determination,

Commerce conducted an on-site verification of Kejriwal.  *See*

---

[4](...continued)
        (1) necessary information is not available on
       the record, or

        (2) an interested party or any other person——

              (A) withholds information that has
              been requested by the administering
              authority or the Commission under
              this subtitle,

              (B) fails to provide such
              information by the deadlines for
              submission of the information or in
              the form and manner requested
              . . . ,

              (C) significantly impedes a
              proceeding under this subtitle, or

              (D) provides such information but
              the information cannot be verified
              . . . . ,

the administering authority and the Commission shall,
subject to section 1677m(d) of this title, use the
facts otherwise available in reaching the applicable
determination under this subtitle.

If Commerce determines that the above criteria are met, and
makes the separate subjective determination that the respondent
has "failed to cooperate by not acting to the best of its ability
to comply with a request for information," then, under 19 U.S.C.
§ 1677e(b), the agency "may use an inference that is adverse to
the interests of that party in selecting from among the facts
otherwise available."  19 U.S.C. § 1677e(b).

Final Results, 71 Fed. Reg. at 45,012.  Commerce's verification analyzed the company's business and determined that its primary business was not producing and exporting the subject CLPP, but rather trading newsprint.  *See* Def.'s Br. 4; I&D Memo, Comm. 2 at 6.  Commerce's verification report "explained that Kejriwal finds suppliers and purchasers of newsprint in the domestic market, and negotiates purchase and sale prices with the manufacturers and purchasers of newsprint."  Def.'s Br. 4-5 (citing Memorandum to File from Laurens van Houten re: Verification of the Cost Response of Kejriwal Paper Limited in the Antidumping Investigation of Lined Paper from India at 4-5 (Dep't of Commerce June 13, 2006) (the "Verification Report")).

The Department concluded that Kejriwal incurred "significant expenses" in financing and conducting the aforementioned transactions, but that, as a strategic business decision, it did not take title to or possession of the newsprint involved in these transactions in order "to take advantage of a 16 percent tax exemption offered by the Government of India if newsprint 'is supplied directly from the manufacturer to the end consumers.'" Def.'s Br. 5 (quoting Verification Report at 8).

Commerce issued its Final Results in August 2006.  Final Results, 71 Fed. Reg. at 45,012.  These Final Results deviated from the Preliminary Determination in one significant respect. Commerce determined that the AFA rate assigned to Navneet and

Aero, which was based upon Kejriwal's highest transaction-specific dumping margin, "was aberrational because it stemmed from a single sale of a quantity that was significantly less than the size of the average sales quantity." Def.'s Br. 5-6 (citing I&D Memo, Comm. 15). As a result, in the Final Results, Commerce assigned Navneet and Aero the rate of 23.12 percent, the second highest margin calculated for Kejriwal during the proceeding. *See* Final Results, 71 Fed. Reg. at 45,103. This rate was a significant decrease from the preliminary rate of 110.43 percent. In doing so, the Department reasoned that, unlike the higher rate, the 23.17 percent rate was both "not aberrational and sufficiently higher than Kejriwal's calculated rate to induce respondents to cooperate fully with Commerce's requests." Def.'s Br. 6 (citation omitted).

In addition to assigning this AFA rate, the Department made other determinations in the Final Results. With regard to Kejriwal, Commerce granted it both a scrap offset and an excise tax rebate offset, and also "revised the calculations from the Preliminary Determination to take into account its findings at verification and comments received from the parties." *See* Def.'s Br. 5. Commerce thus included the cost of newsprint turnover in the calculations of Kejriwal's financial expense ratio. Def.'s Br. 6. In addition, the Department allocated a proportionate share of general and administrative ("G&A") expenses to

Kejriwal's newsprint business.  The Final Results provided
Kejriwal a final weighted-average dumping margin of 3.91 percent.
*See* Final Results, 71 Fed. Reg. 45,014.


## STANDARD OF REVIEW

The court reviews the Final Results under the substantial
evidence and in accordance with law standard set forth in 19
U.S.C. § 1516a(b)(1)(B)(i) ("The court shall hold unlawful
any determination, finding, or conclusion found . . . to be
unsupported by substantial evidence on the record, or otherwise
not in accordance with law . . . .").  "Substantial evidence is
such relevant evidence as a reasonable mind might accept as
adequate to support a conclusion."  *Huaiyin Foreign Trade Corp.
(30) v. United States*, 322 F.3d 1369, 1374 (Fed. Cir. 2003)
(quotation omitted).

Further, the court must "review verification procedures
employed by Commerce in an investigation for abuse of discretion
rather than against previously-set standards."  *Micron Tech.,
Inc. v. United States*, 117 F.3d 1386, 1396 (Fed. Cir. 1997) ("By
requiring that Commerce report, on a case-by-case basis, the
methods and procedures used to verify submitted information,
Congress has implicitly delegated to Commerce the latitude to
derive verification procedures *ad hoc*.") (citations and footnotes
omitted).

DISCUSSION

I.  Commerce's Selection of an AFA Rate for Navneet and Aero

The Association takes issue with Commerce's reduction of the AFA rate assigned to Navneet and Aero from the rate found in the Preliminary Determination (110.43 percent), to that in the Final Results (23.17 percent).  It maintains that Commerce's 23.17 percent AFA rate is unlawful because it "is not relevant to the uncooperative respondents [Navneet and Aero], does not reflect the likely rate for [them] had they cooperated . . . , and is not sufficiently high so as to discourage [their] noncompliance in future proceedings."  Ass'n Br. 5.

In support of its arguments, the Association claims that Commerce improperly relied on Kejriwal's data in calculating the AFA rate without explaining the relevance of this data to Navneet and Aero.  Furthermore, the Association insists that there is no record evidence demonstrating that the AFA rate assigned to Navneet and Aero reflects a rate that would have been calculated for them had they cooperated (including "a built-in increase as a deterrent to noncompliance").  Ass'n Br. 11.  To support its position, the Association analyzed the data actually submitted by Navneet and Aero (but rejected by Commerce), and urges that even "a cursory analysis of the data . . . suggests that an [AFA] rate based on what their margins would have [been] in the event of their cooperation, would differ substantially from the rate

selected by the Department."[5]  Ass'n Br. 11.

In its papers, Commerce maintains that its selection of the 23.17 percent rate was lawful and supported by substantial evidence.  Def.'s Br. 19.  Commerce argues that the higher 110.43 percent rate was aberrational and thus it properly selected a different, albeit lower, rate that was "based on corroborated, verified, and reliable record information."  Def.'s Br. 10. Further, Commerce insists that the rate selected was "indicative of the respondents' customary selling practices and . . . rationally related to the transactions to which the adverse facts available are being applied."  Def.'s Br. 15 (quotation omitted).

As to the Association's analysis of the data submitted by Navneet and Aero, Commerce argues that it is inherently flawed because it relies upon data rejected by the Department as incomplete and unverifiable.  For Commerce, information that was found unreliable for calculating an actual rate cannot be considered "substantial evidence" for purposes of questioning the assigned rate.  *See* Def.'s Br. 16.  Finally, Commerce asserts that it acted within its discretion in selecting the AFA rate and

_____

[5]  For example, analyzing Navneet's data and assuming the validity of the information reported, the Association claims to have calculated a margin slightly higher than the 23.17 percent rate assigned.  The Association insists that this proposed rate, which it describes as "extremely conservative," does not include any built-in increase to deter future noncompliance.  Ass'n Br. 11-12.  Accordingly, for the Association, the 23.17 percent rate assigned was not high enough to encourage future cooperation in antidumping investigations.  Ass'n Br. 12.

determining that it was sufficiently high to deter noncompliance in the future.

Here, no party is challenging Commerce's decision to use an AFA rate.[6]  Rather, the Association faults Commerce's manner of selecting the rate.  "Commerce has broad, but not unrestricted, discretion in determining what would be an accurate and reasonable dumping margin where a respondent has been found uncooperative*."  Reiner Brach GmbH & Co. KG v. United States*, 26 CIT 549, 565, 206 F. Supp. 2d 1323, 1339 (2002) ("*Reiner*").  When applying an adverse inference, Commerce may rely on information from the petition, the final determination, previous reviews or determinations, and any other information placed on the record. *See F.lli De Cecco Di Filippo Fara S. Martino S.p.A. v. United*

---

[6]  The Preliminary Determination explains why the application of AFA was warranted:

> Throughout [the investigative] process, there has been a consistent pattern of non-responsiveness and confusing, incomplete, and inconsistent information provided by Aero and Navneet.  As a result of numerous, serious deficiencies, we are unable to adequately determine whether the cost information contained in [their] responses reasonably and accurately reflects the costs incurred by these companies to produce the subject merchandise.  Without this information, we cannot accurately calculate LTFV [less than fair value] margins for these companies.

Preliminary Determination, 71 Fed. Reg. at 19,709-10.

States, 216 F.3d 1027, 1029-32 (Fed. Cir. 2000) ("*De Cecco*") ("In the case of uncooperative respondents, the discretion granted by the statute . . . allow[s] Commerce to select among an enumeration of secondary sources as a basis for its adverse factual inferences.") (citing 19 U.S.C. § 1677e).

An AFA rate must "be a reasonably accurate estimate of the . . . actual rate, albeit with some built-in increase as a deterrent to non-compliance." *Ta Chen Stainless Steel Pipe, Inc. v. United States*, 298 F.3d 1330, 1340 (Fed. Cir. 2004) (citing *De Cecco*, 216 F.3d at 1032). Therefore, "[a]n AFA rate must be both reliable and bear a rational relationship to the respondent." *See Shandong Huarong Gen. Group Corp. v. United States*, 31 CIT __, __, Slip Op. 07-4 at 9 (Jan. 9, 2007) (not reported in the Federal Supplement) (citations omitted).

Because this case concerns an investigation, rather than an administrative review, under 19 U.S.C. § 1677e(b)(3), Commerce could not rely on the results of a previous review of Aero and Navneet's behavior, as is common in AFA determinations. *See, e.g.*, *Shandong Huarong Mach. Co. v. United States*, 31 CIT __, __, Slip Op. 07-169 at 10-11 (Nov. 20, 2007) (not reported in the Federal Supplement). Furthermore, Commerce determined that the margins included in the petition "greatly exceeded the ranges of rates calculated during the investigation" and, therefore, lacked probative value. *See* Def.'s Br. 14 (citations omitted). Thus,

Commerce turned to record data from the investigation obtained from Kejriwal.

The court finds Commerce's 23.17 percent rate was reasonable. In assigning this rate, Commerce was exercising its discretion as permitted by the statute, and was attempting to "balance the statutory objectives of finding an accurate dumping margin and inducing compliance, rather than creat[e] an overly punitive result." *Timken Co. v. United States*, 354 F.3d 1334, 1335 (Fed. Cir. 2004) (citing *De Cecco*, 216 F.3d at 1032). As Commerce correctly points out, relying upon Navneet and Aero's rejected data would ignore the deficiencies in their responses that render them unreliable and thus not a source of substantial evidence. Any rate employing Navneet and Aero's rejected data——both as the basis of calculating an actual rate or for purposes of comparison——would therefore be invalid. *See Shanghai Taoen Int'l Trading Co. v. United States*, 29 CIT 189, 199, 360 F. Supp. 2d 1339, 1349 (2005) (finding that a preliminary margin relying upon data that was rejected and lacked credibility "has no validity").

For Commerce, the rate it selected, although not calculated using Navneet and Aero's data, "is indicative of the respondents' customary selling practices and is rationally related to the transactions to which the [AFA] rates are being applied" because it was calculated in the POR for a company in the same business.

*See* I&D Memo, Comm. 15 at 38.  That is, Commerce selected a rate it perceived to be "within the mainstream of Kejriwal's transactions (i.e., transactions that reflect sales of products that are representative of the broader range of models used to determine [normal value])."  I&D Memo, Comm. 15 at 38.  Further, having concluded that the 110.43 percent rate was aberrational because it was "from a single sale with a sales quantity that is less than two percent of the average sales quantity," Commerce determined that "the second highest margin is not aberrational because its quantity . . . is within one standard deviation of the mean [quantity of merchandise in Kejriwal's reported transactions] . . . [and] it was a sale of notebooks."  *See* Memorandum from Christopher Hargett to File re: Final Determination in the Antidumping Investigation of CLPP from India: Selection of Total AFA Rate" at 2 (Dep't of Commerce July 31, 2006).

Thus, here, though Commerce was not relying on Navneet and Aero's data, it did seek to ensure that its determination related to the companies to the greatest extent possible under the circumstances.  That is, it (1) relied on verified data from another producer and exporter of CLPP in India during the same time period, (2) used a transaction that was of an adequate quantity of subject merchandise, and (3) confirmed that the quantity was appropriate with standard deviation analysis.

This Court's decision in *Shanghai Taoen International Trading Co. v. United States*, 29 CIT 189, 360 F. Supp. 2d 1339 (2005) ("*Shanghai Taoen*"), is instructive. In *Shanghai Taoen*, plaintiff challenged Commerce's final results of an administrative review of an antidumping duty order on crawfish tail meat from the People's Republic of China ("PRC"). Among other things, the plaintiff challenged the AFA rate assigned to it by Commerce. Commerce had assigned plaintiff a rate calculated for a different respondent from a prior administrative review.

In upholding Commerce's AFA rate, the *Shanghai Taoen* Court observed that: (1) "Commerce had no probative alternatives" to the assigned margin; (2) this was the plaintiff's first administrative review on exports of subject merchandise so that there was no prior antidumping margin for Commerce to select; and, as referenced above, (3) proposed rates calculated with deficient data "[have] no validity after Commerce's credibility conclusion" (which led it to apply AFA in the first place). *Shanghai Taoen*, 29 CIT at 199, 360 F. Supp. 2d at 1348. Thus, the Court found that Commerce's selected AFA rate was "rationally related" to the plaintiff "because (1) the rate reflects recent commercial activity by a crawfish tail meat exporter from the PRC, and (2) [the plaintiff's] failure to accurately respond to Commerce's producer questions has resulted in an egregious lack

of evidence on the record to suggest an alternative rate." *Id.* at 199, 360 F. Supp. 2d at 1348.

The logic of *Shanghai Taoen* is equally applicable here. Although *Shanghai Taoen* involved an administrative review and this case involves an investigation, the theory of the case is useful because *Shanghai Taoen* involved the first administrative review in which the plaintiff participated. Thus, in both cases, no prior rates for the plaintiffs were available and Commerce could not rely on the plaintiffs' own deficient data to determine a rate. Therefore, here, it was reasonable for Commerce to look to Kejriwal's data because: (1) it "reflects recent commercial activity" by an exporter of subject merchandise from India, and (2) it was Aero and Navneet's reporting deficiencies that resulted in the lack of evidence on the record for Commerce to select an alternative rate. *See id.* at 199, 360 F. Supp. 2d at 1348. Accordingly, Commerce selected, based upon the verified information available to it in the record, a rate that was reliable and relevant to Navneet and Aero. The court finds that Commerce acted reasonably. *See NSK, Ltd. v. United States*, 28 CIT 1535, 1562, 346 F. Supp. 2d 1312, 1336 (2004) (stating that "Commerce has leeway in calculating the applicable AFA rate" for an uncooperative respondent).

As to whether the rate was high enough to encourage future compliance, Commerce reasoned that the AFA rate "selected [23.17

percent rate] is sufficiently higher than the calculated [3.91 percent] rate of the cooperative respondent [Kejriwal] in this investigation to induce respondents [Navneet and Aero] to cooperate fully with the Department's requests for accurate, complete and timely data."  I&D Memo, Comm. 15 at 38.  Given the record before it, it cannot be said that Commerce was unreasonable in finding that the 23.17 percent AFA rate, which is nearly 600 percent greater than Kejriwal's rate, would encourage Navneet and Aero to comply fully in future reviews and investigations.  *See De Cecco*, 216 F.3d at 1032 ("Particularly in the case of an uncooperative respondent, Commerce is in the best position, based on its expert knowledge of the market and the individual respondent, to select adverse facts that will create the proper deterrent to non-cooperation with its investigations and assure a reasonable margin."); *Ta Chen Stainless Steel Pipe, Inc.*, 298 F.3d at 1340 ("While Commerce may have chosen the [AFA] rate with an eye toward deterrence, Commerce acts within its discretion so long as the rate chosen has a relationship to the actual sales information available.").

Accordingly, the court sustains as lawful and supported by substantial evidence Commerce's selection of an AFA rate for Navneet and Aero.

II.  Commerce's Grant of a Scrap Offset to Kejriwal

Commerce generally will only grant an offset to normal value,[7] for sales of scrap generated during the production of the subject merchandise, if the respondent can demonstrate that the scrap is either resold or has commercial value and re-enters the respondent's production process.  *See Shandong Huarong Mach. Co. v. United States*, 29 CIT 484, 487, Slip Op. 05-54 at 6 (2005) (not reported in the Federal Supplement).  The Association argues that Kejriwal claimed a scrap offset to the cost of manufacturing CLPP, but that the company "neither reintroduced into the production process nor sold [the scrap] during the period of investigation [('POI')]."  Ass'n Br. 20.  Therefore, the Association complains that Commerce erred in granting the offset.

The Association's primary objection to Commerce's decision to grant the offset to Kejriwal is that, even if the scrap had a value, the "value was not realized during the [POI]."  Ass'n Br. 21.  Thus, the Association maintains that Commerce's decision "to

_____

[7]  Normal value or home market value is defined as

> the price at which the foreign like product
> is first sold (or, in the absence of a sale,
> offered for sale) for consumption in the
> exporting country, in the usual commercial
> quantities and in the ordinary course of
> trade and, to the extent practicable, at the
> same level of trade as the export price or
> constructed export price . . . .

19 U.S.C. § 1677b(a)(1)(B)(i).

offset period costs with revenue generated afterwards . . . distort[s] the actual costs that Kejriwal faced during the relevant time period." Ass'n Br. 24. Accordingly, it claims that Kejriwal did not meet its burden of demonstrating that an offset was warranted. *See* Ass'n Br. 24-25.

Commerce, for its part, maintains that it properly granted Kejriwal a scrap offset because the scrap was "directly related to subject merchandise produced during the [POI]," and was recorded in Kejriwal's books during the POI in accordance with the accrual method of accounting. Def.'s Br. 20. Commerce points to the "reasoned explanation" contained in its Issues and Decisions Memorandum to counter the Association's assertion that its decision to grant the offset was inadequately explained. Def.'s Br. 20 (citing I&D Memo, Comm. 4). By way of explanation, Commerce states that, although Kejriwal neither sold nor reintroduced the scrap during the POI, it did account for the scrap's estimated value on its books and that this treatment is consistent with Commerce's past practice. *See* Def.'s Br. 20-21 (citation omitted) (reasoning that because "the scrap offset was based upon the costs of merchandise created during the [POI] . . . . and was recorded in Kejriwal's books on an accrual basis for the [POI] . . . the question of when the actual scrap sale occurred [is] irrelevant)".

Kejriwal notes that, because it first began producing

subject merchandise during the POI (i.e., was a start-up operation), it sold much of the scrap generated during the POI in the several months after the POI ended, rather than during it. *See* Kejriwal Resp. Pl.'s Mot. 9-10 (citing Verification Report at 15-17). Thus, "although Kejriwal's sales of scrap were outside of the POI, the revenue from sales was verifiable, and Commerce appropriately used the verified sales of scrap generated during the POI to value the required scrap offset." *See* Kejriwal Resp. Pl.'s Mot. 10 (citations omitted). In other words, Commerce examined Kejriwal's financial records and concluded that, although Kejriwal did not sell the scrap during the POI, it estimated the value of the scrap based upon average market prices, recorded that amount in its stock statement and balance sheets, and was able to trace this estimated value to Kejriwal's own invoices for sales after the POI.

Kejriwal argues, therefore, that Commerce complied with the statutory requirements of 19 U.S.C. § 1677(b)(f)(1)(A) in its calculations. For Kejriwal, Commerce: (1) "calculate[d] [costs] based on the records of the exporter or producer of the merchandise, if such records are kept in accordance with the generally accepted accounting principles ["GAAP"] of the exporting country . . . and reasonably reflect the costs associated with the production and sale of the merchandise," and (2) "consider[ed] all available evidence on the proper allocation

of costs, including that which is made available by the exporter or producer on a timely basis, if such allocations have been historically used by the exporter or producer . . . ."  19 U.S.C. § 1677(b)(f)(1)(A).  Accordingly, Kejriwal insists that, using the accrual method of accounting, in accordance with Indian GAAP, it recorded the estimated value of scrap generated "as a manufacturing cost" and that Commerce correctly considered this fact when it reviewed its books.  *See* Kejriwal Resp. Pl.'s Mot. 11 (citing Verification Report at 23).

The Association's claim presents both a legal and factual question: (1) whether Commerce's methodology in granting Kejriwal a scrap offset was in accordance with law, and (2) whether Commerce supported its decision to grant Kejriwal the offset with substantial evidence.  As to the Association's legal claim, this Court, in *Ames True Temper v. United States*, 31 CIT __, __, Slip Op. 07-133 at 10 (Aug. 31, 2007) (not reported in the Federal Supplement) ("*Ames*"), recently observed "the antidumping statute is silent as to how Commerce is to determine whether a respondent is entitled to a scrap offset to normal value and, if so entitled, how to calculate the amount of the offset."  As such, the court's role is to assess if Commerce's determination is "based on a reasonable permissible construction of the statute." *Id.* at __, Slip Op. 07-133 at 11-12 (citing *Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 843 (1984));

*see also Guangdong Chem. Imp. & Exp. Corp. v. United States*, 30
CIT __, __, 460 F. Supp. 2d 1365, 1373 (2006) ("19 U.S.C.
§ 1677b(c) does not mention the treatment of byproducts,
nonetheless, Commerce sometimes grants a respondent a credit for
a by-product . . . generated in the manufacturing process [that
is] either reintroduced into production or sold for revenue.")
(quotations and citation omitted).

The court finds that Commerce acted in accordance with law
in granting Kejriwal a scrap offset. The agency based its
decision on its review of "the normal books and records of
[Kejriwal] in accordance with Indian generally accepted
accounting principles," kept on an accrual basis. I&D Memo,
Comm. 4 at 11. In addition, although Kejriwal's sales of scrap
were outside of the POI, Commerce was able to verify the revenue
from those sales and compare it to the amount recorded on
Kejriwal's books during the POI. As a result, the Department
confirmed the accuracy of Kejriwal's estimated values by tracing
Kejriwal's actual average sales value to its invoices. I&D Memo,
Comm. 4 at 11. Thus, the amount of the offset was supported by
substantial evidence. *See Thai Pineapple Pub. Co. v. United
States*, 187 F.3d 1362, 1366 (Fed. Cir. 1999) ("As a general rule,
an agency may either accept financial records kept according to
generally accepted accounting principles in the country of
exportation, or reject the records if accepting them would

distort the company's true costs.") (citation omitted).

Accordingly, the court cannot credit the Association's argument that Commerce did not offer an adequate explanation for its decision. "Commerce is [obligated] to adequately explain how its chosen methodology achieves the required result [of determining antidumping margins as accurately as possible]." *Shandong Huarong Mach. Co.*, 29 CIT at 489, Slip Op. 05-54 at 10 (citations omitted). It has done so here.

It is clear that, because its CLPP business was a start-up operation, Kejriwal would not in the ordinary course of business sell its scrap during the POI. It is equally clear that its process generates valuable scrap and that Commerce was able to determine the scrap's value. Thus, in granting Kejriwal the scrap offset, Commerce acted reasonably by trying to present a true picture of Kejriwal's business under the circumstances. *See Ames*, 31 CIT at __, Slip Op. 07-133 at 14 (sustaining a scrap offset because "Commerce properly based its decision to grant Huarong the steel scrap offset on the company's financial books and records, applied a reasonable methodology, [and] supported its conclusion with substantial evidence . . . .").

Therefore, the court finds Commerce's conclusions to be in accordance with law and supported by substantial evidence and sustains Commerce's scrap offset.

III.  Commerce's Grant of an Excise Tax Rebate Offset to Kejriwal

The Association additionally argues that Commerce's decision to grant Kejriwal an excise tax rebate offset was improper. *See* Ass'n Br. 25-26.  Kejriwal paid an excise tax[8] on the purchase of raw materials in India and then received a rebate on the tax paid when the finished products were exported.  Ass'n Br. 25-26 (citation omitted).  Given that Kejriwal's lined paper business was a start-up operation, the rebates "in most cases, . . . occurred after the [POI]."  Ass'n Br. 26 (citing Verification Report at 7).  According to the Association, under these circumstances, the grant of an offset was improper because "the

---

[8]  Kejriwal explains:

> India's excise tax is an indirect internal tax levied on goods manufactured in India and intended to be paid by the ultimate consumer. A manufacturer such as Kejriwal pays the excise tax on its inputs (currently 16% for most products), and passes the tax on to its own domestic customers by including the tax on its invoices.  The tax is not passed on to customers in a foreign country.  Thus it is an "internal" tax.  When the final product is exported, India grants credits and rebates to Indian exporters.  The Indian government also allows exporters to purchase inputs under bond, whereby the exporter pays no initial excise tax on its inputs.  As with an application for an excise tax rebate, the exporter must provide proof of export for all merchandise produced from inputs purchased under bond.  In all cases, the exporter pays no excise tax.

*See* Kejriwal Resp. Pl.'s Mot. 15-16 (footnote and citations omitted).

tax paid impacted . . .[Kejriwal's] costs of manufacture, but . . . the rebates had no effect at all on period costs." Ass'n Br. 26.

The Association, therefore, maintains that Kejriwal did not meet its burden of demonstrating that an offset was proper because Kejriwal necessarily could not show that the rebates reduced its costs during the POI. Thus, it argues that Commerce's grant of a rebate here is "illogical" and asks the court to remand the matter to Commerce for reconsideration. *See* Ass'n Br. 26.

Commerce insists that the grant of an excise tax rebate offset to Kejriwal was warranted because the rebate was directly related to Kejriwal's production of CLPP during the POI. *See* Def.'s Br. 19-20. That is, "[a]s with the value of scrap revenue, Commerce found that Kejriwal accrued or credited the tax rebate in the current period in its normal books and records." Def.'s Br. 21. Commerce argues that the Association's "focus upon the fact that the rebate was not received during the current [POI] ignores record facts," i.e., that Kejriwal's lined paper business was a start-up operation, it utilized the accrual method of accounting, and it accounted for the value of the tax rebate on its books. Def.'s Br. 22. Therefore, even though the revenue was not received during the POI, Commerce contends that the offset was justified and asks the court to sustain its

determination.  *See* Def.'s Br. 22-23.

For its part, Kejriwal asserts that "Commerce's recognition of an excise tax offset was correct in every respect, in accordance with India's GAAP and India's tax law and in accordance with U.S. antidumping law."  *See* Kejriwal Resp. Pl.'s Mot. 15-16 (citing 19 U.S.C. § 1677b(e)(3), which states that "the cost of materials shall be determined without regard to any internal tax in the exporting country imposed on such materials or their disposition which are remitted or refunded upon exportation of the subject merchandise produced from such materials").  Thus, Kejriwal asserts that Commerce verified its accounting of excise taxes paid and that, in fact, they were later rebated, and that the Department's decision to grant the offset conforms with its past practice.  *See* Kejriwal Resp. Pl.'s Mot. 17-18 (citing Stainless Steel Bar From India, 65 Fed. Reg. 48,965 (Dep't of Commerce Aug. 10, 2000) (final results); Certain Stainless Steel Wire from India, 65 Fed. Reg. 31,302 (Dep't of Commerce May 17, 2000)(final results).

As with the scrap offset, Commerce relied on a review of Kejriwal's books to justify the grant of an excise tax rebate offset.  Specifically, the Department observed that: (1) Kejriwal paid excise taxes, (2) Kejriwal received a refund for these paid taxes, albeit after the POI, and therefore (3) "[i]n the end, no taxes were paid" upon CLPP during the POI.  Def.'s Br. 21

(quoting I&D Memo, Comm. 7 at 15).  Commerce further observed that Kejriwal accounted for the tax rebate in its books for the time period covered by the POI in accordance with the accrual method of accounting.  *See* Def.'s Br. 20-21.

The court sustains Commerce grant of an excise tax offset to Kejriwal.  Commerce acted properly under 19 U.S.C. § 1677b(f)(1)(A) (requiring Commerce to calculate costs based on the records of the exporter if kept in accordance with GAAP of the exporting country and to "consider all available evidence"), and in accordance with the case law.  *See Elkem Metals Co. v. United States*, 468 F.3d 795, 802 (Fed. Cir. 2006) ("[I]t is entirely appropriate for Commerce to make an individual determination as to whether and to what extent [a value-added tax] is, given the circumstances of a particular country and company, a cost."); *FAG U.K. LTD. v. United States*, 20 CIT 1277, 1290, 945 F. Supp. 260, 271 (1996) ("[T]his Court has consistently upheld Commerce's reliance on a firm's expenses as recorded in the firm's financial statements, as long as those statements were prepared in accordance with the home country's GAAP and do not significantly distort the firm's actual costs.").

It is apparent that Commerce's grant of an excise tax rebate offset to Kejriwal was proper as Commerce based its decision on Kejriwal's financial records, circumstance as a start-up operation, and "economic realities."  *See Elkem Metals Co.*, 468

F.3d at 802.


IV.  Commerce's Calculation of Kejriwal's Financial Expense Ratio

The court next considers the Association's claim that Commerce's calculation of Kejriwal's financial expense ratio was flawed and unlawful.  In antidumping investigations, Commerce must determine whether merchandise is sold, or is likely to be sold, at less than fair value by making "a fair comparison . . . between the export price, or constructed export price and normal value."[9]  19 U.S.C. § 1677b(a).  During Commerce's investigation, it determined that "Kejriwal . . . did not sell subject merchandise in the ordinary course of trade in its home market during the POI."  *See* Preliminary Determination, 71 Fed. Reg. at 19,707.  Therefore, Commerce concluded that it "must use constructed value . . . in its calculation of normal value . . . ."  *See id.*  No party objects to this conclusion.

The financial expense ratio is a component of Commerce's

---

[9]  The "export price" is "the price at which the subject merchandise is first sold . . . by the producer or exporter of the subject merchandise outside of the United States to an unaffiliated purchaser in the United States or to an unaffiliated purchaser for exportation to the United States," as adjusted.  19 U.S.C. § 1677a(a).

"Constructed export price" is "the price at which the subject merchandise is first sold . . . in the United States . . . by or for the account of the producer or exporter of such merchandise or by a seller affiliated with the producer or exporter, to a purchaser not affiliated with the producer or exporter," as adjusted.  19 U.S.C. § 1677a(b).

constructed value calculation.  Under 19 U.S.C. § 1677b(e)(1)(B),

when calculating constructed value, Commerce is directed to add

an "'an amount for general expenses and profit equal to that

usually reflected in sales of merchandise of the same general

class or kind as the merchandise under consideration . . .' to

the cost of materials and of fabrication or other processing."[10]

---

[10]  "Congress has not clarified what 'general expenses' are
or how they are calculated . . . . [however,] [p]ursuant to the
discretion granted to it by Congress[,] . . . Commerce devised a
methodology for calculating general expenses.  Commerce includes
in general expenses both (1) selling, general and administrative
expenses, and (2) financial expenses."  *Gulf States Tube Div. of
Quanex Corp. v. United States*, 21 CIT 1013, 1033, 981 F. Supp.
630, 648 (1997) (citation omitted).

Commerce asks that a company calculate its financial expense
ratio, or interest expense ratio, as follows:

> . . . If your company is a member of a
> consolidated group of companies, calculate
> your financial expense based on the
> consolidated audited fiscal year financial
> statements of the highest consolidation level
> available.  In calculating your company's net
> interest ratio, use the full-year net
> interest expense and [cost of goods sold]
> reported in the <u>consolidated</u> audited fiscal
> year financial statements for the period that
> most closely corresponds to the [period of
> investigation].
>
> In calculating net interest expense for [cost
> of production] and CV, include interest
> expense relating to both long- and short-term
> borrowings made by your company.  Reduce the
> amount of interest expense incurred by any
> interest income earned by your company on
> short-term investments of its working
> capital.  Demonstrate how the interest
> income, interest expense, and [cost of goods

(continued...)

*See Gulf States Tube Div. of Quanex Corp. v. United States*, 21 CIT 1013, 1033, 981 F. Supp. 630, 648 (1997) (citation omitted).

The Association maintains that Commerce improperly "included newsprint turnover in Kejriwal's costs of goods sold and in the financial expense ratio calculations." Ass'n Br. 13. It argues that the calculation was contrary to Commerce's established practices and inadequately explained. Ass'n Br. 13. According to the Association, "[t]he Department's decision to include newsprint turnover value in the denominator of the financial expense ratio calculations was inconsistent with the treatment of the same item in the [general and administrative] expense ratio calculations," where the Department did not include newsprint turnover value in the denominator. Ass'n Br. 14-15. It argues that Commerce has consistently considered an item to be "part of the costs of goods sold for purposes of calculating the financial expense ratio where the item is recorded as part of the costs of goods sold in a respondent's audited financial statements."

---

[10](...continued)
sold] used in the ratio reconcile to your company's audited fiscal year financial statements. To compute the per-unit amount of net interest expense, multiply the net interest expense ratio by the per-unit [total cost of manufacture] for each of the [control numbers].

*See* Standard Section D - Cost of Production and Constructed Value Questionnaire at D-14, *available at* http://ia.ita.doc.gov/questionnaires/q-inv-sec-d-092106.pdf.

Ass'n Br. 16 (citations omitted).

The Association notes that the cost of newsprint is not included as part of Kejriwal's cost of goods sold on its financial statements because it is a trader rather than a manufacturer of newsprint.  Thus, according to the Association, Commerce's calculation contradicts its "consistent past practice."  Ass'n Br. 15-17 (citing Certain Pasta from Italy, 64 Fed. Reg. 6,615 (Dep't of Commerce Feb. 10, 1999) (notice of final results); Silicomanganese from India, 67 Fed. Reg 15,531 (Dep't of Commerce Apr. 2, 2002) (notice of final determination); Certain Frozen and Canned Warmwater Shrimp from Thailand, 69 Fed. Reg. 47,100 (Dep't of Commerce Aug. 4, 2004) (notice)).

For its part, Commerce concedes that it departed from its past practice when it included the cost of newsprint traded in Kejriwal's cost of goods sold, but argues that doing so was necessary because of the unique nature of Kejriwal's business model.  Def.'s Br. 23 (citing I&D Memo, Comm. 2).  That is, "[w]hile it is [Commerce's] normal practice to use the [cost of goods sold] from the income statements as [its] denominator, . . . [the] unusual facts in this case [thwarted] the purpose of the allocation ratio because of the structure of the newsprint transactions."  *See* I&D Memo, Comm. 2 at 6.  In other words, Commerce determined that, even though Kejriwal incurred great expense as a trader of newsprint, because it never took title to

the paper, using Commerce's normal calculation these significant expenses would not have been included in its cost of goods sold, and therefore a deviation was justified.  *See* I&D Memo, Comm. 2 at 6.

Thus, Commerce argues that, when necessary, "it is free to change its methodology as long as it fully explains its reasoning for doing so."  Def.'s Br. 24-25 (explaining that Commerce determined that following its standard practice in this matter would have led to a "distorted calculation") (citations omitted). Commerce additionally argues that it was justified in including newsprint turnover value in the denominator of Kejriwal's financial expense ratio but not in its G&A expense ratio.  Def.'s Br. 29.  Again, Commerce noted, it did so because this case presented "unusual facts," i.e., the significant proportion of Kejriwal's financial expenses incurred by its trading rather than its sales business.  *See* I&D Memo, Comm. 2 at 6.

Kejriwal asserts that Commerce's calculation of its financial expense ratio was reasonable, supported by substantial evidence, and in accordance with law.  *See* Kejriwal Resp. Pl.'s Mot. 3.  It maintains that the Association seeks to have Commerce calculate a ratio that "ignores the intensity of Kejriwal's financial investment and commitment to its newsprint business." Kejriwal Resp. Pl.'s Mot. 3.  Put another way, Kejriwal argues that Commerce was correct in determining that Kejriwal's

financial expense ratio would have been distorted if Commerce had not included the cost of newsprint traded in the denominator.

Kejriwal further notes that its audited financial statements include "numerous references" to its newsprint turnover and that "[d]uring verification, Commerce ascertained that approximately 69% of Kejriwal's financial expenses were attributable solely to the company's newsprint business, compared to about 22% attributable to the production of subject merchandise."  Kejriwal Resp. Pl.'s Mot. 3-4 (citing Verification Report at 36).

It is well-settled that "[a]n agency is obligated to follow precedent, and if it chooses to change, it must explain why." *M.M. & P. Mar. Advancement, Training, Educ. & Safety Program (MATES) v. Dep't of Commerce*, 729 F.2d 748, 755 (Fed. Cir. 1984); *Greater Boston Television Corp. v. FCC*, 444 F.2d 841, 852 (D.C. Cir. 1970) ("[A]n agency changing its course must supply a reasoned analysis indicating that prior policies and standards are being deliberately changed, not casually ignored, and if an agency glosses over or swerves from prior precedents without discussion it may cross the line from the tolerably terse to the intolerably mute.") (footnotes omitted).

Here, Commerce was explicit in stating that it was not following its "normal practice."  I&D Memo, Comm. 2 at 6.  This being the case, the court must examine the adequacy of the Department's justification for this deviation.  By way of

explanation, Commerce states that it typically uses the cost of goods sold from a respondent's income statements as the denominator of the financial expense ratio. I&D Memo, Comm. 2 at 6. Commerce decided here, however, that because of Kejriwal's significant newsprint business, it was "appropriate to include the value of the newsprint traded as part of the denominator of the financial expense ratio in order to allocate the expenses to all of Kejriwal's business activities." I&D Memo, Comm. 2 at 6. Commerce arrived at this decision after considering arguments advanced by both Kejriwal and the Association at the agency level and verifying Kejriwal's financial expenses.

Having reviewed Commerce's findings and reasoning, the court concludes that Commerce adequately explained itself and supplied the "reasoned analysis" necessary to depart from its normal practice. *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 42 (1983). Commerce agreed with Kejriwal that it would be unreasonable to include only cost of goods sold in the denominator in calculating the financial expense ratio because the financing costs associated with Kejriwal's newsprint business far exceeded the cost of goods sold (i.e., its CLPP business) reflected in Kejriwal's financial statements. That is, because the newsprint line of business incurred significant financial expenses, it was not reasonable to allocate all financial expenses to the CLPP line of business.

I&D Memo, Comm. 2 at 5 ("[A]llocating all financial expenses to lined paper would overstate the cost of production of lined paper."). Thus, Commerce concluded that in order to achieve a true picture of the company's business, an amount must be included for the financial expenses incurred to trade paper, i.e., the amount of interest it paid in financing its newsprint transactions.

Given this analysis, the court cannot credit the Association's assertions that Commerce did not adequately explain its decision or provide adequate reasons for deviating from past precedent. The court's review of the Department's findings reveals that the agency considered the unique facts that Kejriwal's business model presented and made its decision after verifying Kejriwal's financial expenses.[11] Further, having

---

[11] Commerce's Verification Report explains:

> Company records indicated that interest on letters of credit and bill discounting expenses were based to a large extent on the transactions associated with its newsprint operations. Company officials stated that Kejriwal opens letters of credit with the paper manufacturers as the beneficiary. The paper manufacturer then produces and supplies newsprint to the purchaser of newsprint (i.e., the newsprint published). . . . [W]e noted that the newsprint manufacturer will issue an invoice to the newspaper publisher and the newspaper publisher will pay Kejriwal. According to company officials, Kejriwal is obligated to pay the invoice amount to the bank within the stipulated date

(continued...)

acknowledged that it was treating this matter differently than it typically treats financial expense ratio calculations, Commerce provided "adequate guidance to parties affected by its actions" and "present[ed] the reviewing court with a discernable basis to judge" the deviation from its normal practice. *Comm. for Fair Beam Imps. v. United States*, 27 CIT 932, 944, Slip Op. 03-73 at 19-20 (2003) (not reported in the Federal Supplement) (citations omitted).

The court finds that Commerce's determination is reasonable, in accordance with law, and supported by substantial evidence. Accordingly, Commerce's calculation of Kejriwal's financial expense ratio is sustained.

V.    Kejriwal's General and Administrative Expense Ratio

The court next turns to Commerce's calculation of Kejriwal's general and administrative ("G&A") expense ratio,[12] which is

---

[11](...continued)
> irrespective of whether Kejriwal receives the
> payment from the publisher, and in the
> process incurs interest expenses . . . .
> Bank charges on the letters of credit and
> miscellaneous bank charges are incurred for
> establishing the letters of credit,
> negotiating the bill of credit, and various
> expenses charged by the bank.

Verification Report at 36 (citations omitted).

[12]   Under 19 U.S.C. § 1677b(e)(2)(A), Commerce is directed, in calculating constructed value, to include "the actual amounts
(continued...)

challenged by both the Association and Kejriwal.  The G&A expense

ratio is the component of constructed value in which Commerce

accounts for certain of a company's overhead expenses.  These are

expenses incurred during the period of investigation "which

relate indirectly to the general operations of the company rather

than directly to the production process."  *See* Standard Section D

- Cost of Production and Constructed Value Questionnaire at D-18

---

[12](...continued)
incurred and realized by the specific exporter or producer being
examined in the investigation or review for selling, general, and
administrative expenses, and for profits, in connection with the
production and sale of a foreign like product . . . ."

    Furthermore, the statute directs that

> [c]osts shall normally be calculated based on
> the records of the exporter or producer of
> the merchandise, if such records are kept in
> accordance with the generally accepted
> accounting principles of the exporting
> country (or the producing country, where
> appropriate) and reasonably reflect the costs
> associated with the production and sale of
> the merchandise.  The administering authority
> shall consider all available evidence on the
> proper allocation of costs, including that
> which is made available by the exporter or
> producer on a timely basis, if such
> allocations have been historically used by
> the exporter or producer, in particular for
> establishing appropriate amortization and
> depreciation periods, and allowances for
> capital expenditures and other development
> costs.

19 U.S.C. § 1677b(f)(1)(A).  As Kejriwal's motion points out,
however, the antidumping statute "provides . . . no further
guidance or methodology for calculating general and
administrative expenses."  Kejriwal's Br. 14 (citation omitted).

("Standard Questionnaire"), *available at*

http://ia.ita.doc.gov/questionnaires/q-inv-sec-d-092106.pdf.

They "include amounts incurred for general [research and

development] activities, executive salaries and bonuses, and

operations relating to [a] company's corporate headquarters."

Standard Questionnaire at D-18.

For the Association, Commerce's calculation was unlawful

because the Department relied on information not provided by

Kejriwal until verification.  For Kejriwal, Commerce's

calculation was contrary to law and unsupported by substantial

evidence, primarily because it did not include the cost of

newsprint traded in the denominator of the G&A expense ratio as

it had done in computing Kejriwal's financial expense ratio.

1.  Commerce's Verification of Kejriwal's Reporting

The Association argues that Commerce improperly "calculated

Kejriwal's . . . [G&A] expense ratio based on information that

Kejriwal did not provide the Department until verification."

Ass'n Br. 13.  By doing so, the Association maintains, Commerce

violated its own regulations, which state that the purpose of

verification is "to verify the accuracy and completeness of

[previously] submitted factual information," i.e., not to accept

new information.  Ass'n Br. 13.

In making its argument, the Association claims that Kejriwal

submitted "an entirely new analysis of its G&A expenses" at verification, and that Commerce improperly accepted the new data as having been "prepared at its request." Ass'n Br. 17-18 (citing I&D Memo, Comm. 3 at 9). The Association acknowledges that Commerce requested "a detailed analysis" of G&A expenses, but claims that, rather than provide such an analysis, Kejriwal provided new factual information. It insists that Commerce's acceptance of this new information runs counter to the purpose of verification, which is to confirm the accuracy of previously obtained information rather than to gather new information. *See* Ass'n Br. 19 (citing 19 C.F.R. § 351.307(d)). The Association asserts, therefore, that Commerce should have rejected Kejriwal's submission as untimely.

Commerce maintains that Kejriwal's submission was not untimely because the Department "asked Kejriwal to prepare, to clarify and corroborate the data submitted in [its] questionnaire responses." Def.'s Br. 36. Commerce characterizes Kejriwal's submission as a "detailed analysis of information already submitted," rather than new information. Def.'s Br. 36. The Department thus asserts that it acted within its discretion in accepting Kejriwal's analysis and also states that, in limited circumstances,[13] respondents may provide new factual information

---

[13] The Department explains: "Commerce accepts information at verification when '1) the need for that information was not
(continued...)

at verification.

Commerce notes that it sent Kejriwal an agenda before the verification, asking for a more detailed analysis of certain G&A expenses.  *See* Def.'s Br. 37-38; *see also* Letter Dated May 5, 2006 with Attachments from Program Manager to deKieffer & Horgan at 10 (the "Verification Agenda").  The Department adds:

> To the extent that Commerce requested and Kejriwal provided further details regarding particular cost items, accounts, or transactions, the information that was obtained [was] to "corroborate, support, or clarify information already on the record" of the proceeding, in accordance with Commerce practice.

Def.'s Br. 38-39 (quoting Structural Steel Beams From Luxembourg, 67 Fed. Reg. 35,488, Comm. 1 (Dep't of Commerce May 20, 2002) (notice)).  As a result, Commerce argues that the procedures it employed respecting Kejriwal's verification were in accordance with law.

While faulting Commerce's calculation of its G&A expense ratio in other respects, Kejriwal asserts that it timely submitted all information requested by the Department.  *See*

---

[13](...continued)
evident previously, 2) the information makes minor corrections to information already on the record, or 3) the information corroborates, supports, or clarifies information already on the record.'"  Def.'s Br. 37-38 (quoting *CITIC Trading Co. v. United States*, 27 CIT 356, 373, Slip Op. 03-23 at 27-28 (2003) (not reported in the Federal Supplement) (quotations and citations omitted).

Kejriwal Resp. Pl.'s Mot. 6-7. It argues that its G&A analysis submission was fully in accordance with Commerce's requests. In other words, Kejriwal insists that its submission was responsive rather than excessive. *See* Kejriwal Resp. Pl.'s Mot. 7.

Generally, when asked by an interested party, Commerce "shall," to the extent practicable, verify information presented to it during an antidumping review. *See* 19 U.S.C. § 1677m(i)(3); 19 C.F.R. § 351.307(a). As noted above, however, the Department enjoys some discretion in selecting its verification methodology. *See Micron Tech., Inc.*, 117 F.3d at 1396.

With this in mind, the court finds that Commerce correctly accepted Kejriwal's G&A analysis submission provided to the Department at the time of verification. It is within Commerce's discretion to accept such information, particularly when Commerce reasonably believes the information clarifies and corroborates previously submitted information. *See Reiner*, 26 CIT at 560, 206 F. Supp. 2d at 1334 (explaining that Commerce has discretion to accept new information presented during verification that clarifies or corroborates information on the record, but may also reject as untimely "substantial revisions" presented during verification) (citations omitted).

Here, Commerce's Verification Agenda expressly required Kejriwal to prepare, in advance of verification: (1) a review of its newsprint business explaining "how the expenses related to

the Newsprint business is recorded in Kejriwal's financial accounting system;" (2) "[o]btain a schedule that identifies all major categories of selling, general and administrative expenses;" and (3) "[t]race the total of selling, general and administrative expenses to the [company's] financial statements . . . ." *See* Verification Agenda at 4, 10-11.  These requests expanded upon requests previously made in Commerce's Standard Questionnaire.  *See* Standard Questionnaire at D-14, 1 (asking for a G&A breakdown and requesting the respondent to "[d]emonstrate how the G&A expenses and the [cost of goods sold] used in the ratio reconcile to your company's audited fiscal year financial statements").  In addition, Commerce's regulations specifically permit respondents to provide the Department with new factual information at or soon after verification: "factual information requested by the verifying officials from a person normally will be due no later than seven days after the date on which the verification of that person is completed."  *See* 19 C.F.R. § 351.301(b)(1).

Therefore, it was entirely in accordance with law for Commerce to seek clarification as to these topics at the time of verification and for Kejriwal to provide additional responsive information, particularly concerning the extent of its newsprint business.  "Commerce has often accepted new information when . . . the information corroborates, supports, or clarifies

information already on the record."  *CITIC Trading Co.*, 27 CIT at

373, Slip Op. 03-23 at 27-28 (quotations and citations omitted).

Here, as evidenced by Commerce's Verification Report, the

Department "used the analyses provided by Kejriwal and reconciled

them with the information already submitted" and "ensure[d] that

cost data already submitted was categorized correctly."

*See* Def.'s Br. 39; Verification Report at 31-34.  Accordingly, it

cannot be said that Commerce abused its discretion.  *See Am.*

*Alloys, Inc. v. United States*, 30 F.3d 1469, 1475 (Fed. Cir.

1994) ("[T]he statute gives Commerce wide latitude in its

verification procedures.").

2.    Commerce's Calculation of Kejriwal's General and
      Administrative Expense Ratio

For its part, Kejriwal challenges Commerce's calculation of

its G&A expense ratio because the Department did not include the

cost of newsprint traded in the ratio's denominator.  Kejriwal

argues that, by not including the cost of newsprint traded in the

denominator, Commerce failed to adhere to its own precedent and

long-standing practice of calculating a company's G&A expense

ratio for the operations of a company as a whole.

As an initial matter, Kejriwal points to Commerce's

Antidumping Manual to establish Commerce's standard calculation

of the G&A expense ratio.  The Antidumping Manual states, in

pertinent part, that Commerce prefers to calculate the G&A

expense ratio "by dividing the fiscal year G&A expenses by the fiscal cost of goods sold (adjusted for categories of expense not included in [cost of manufacture], such as packing) . . . ." *See* Antidumping Manual Ch. 8 at 58 (Dep't of Commerce Jan. 22, 1998). Commerce then applies the percentage to the cost of manufacture of the product. *See id. But see* Kejriwal's Br. 15, n.16 (acknowledging that Commerce's Antidumping Manual states that it "is for the internal guidance of import administration personnel only and cannot be cited to establish Commerce practice"). Kejriwal then points to this Court's decision in *Floral Trade Council v. United States*, 23 CIT 20, 44, 41 F. Supp. 2d 319, 341 (1999), among others, to note that this Court has repeatedly upheld this method of determining the G&A expense ratio. *See* Kejriwal's Br. 16-17.

According to Kejriwal, after verification, "Commerce realized that it could not calculate an accurate [constructed value] for Kejriwal on a company division basis," and therefore modified its methodology by "identif[ying] certain direct expenses," removing them from the numerator, "and add[ing] them to the denominator as the cost of newsprint revenue." Kejriwal Br. 18. For Kejriwal, Commerce's methodology did not fully account for the significance of its newsprint business. It asserts that "[h]ad Commerce properly calculated the company's G&A expense ratio and thus arrived at an accurate [constructed

value], Kejriwal's corresponding dumping margin would have been *de minimus* and the company would not be subject to the antidumping duty order against [CLPP] from India."  Kejriwal's Br. 19.

To bolster its point, Kejriwal notes that Commerce "verified in great detail" that the bulk of its G&A expenses were attributable to its newsprint business, but Commerce still allocated 91 percent of its G&A expenses to subject CLPP and only 9 percent to non-subject merchandise.  *See* Kejriwal Br. 19-20. Kejriwal further argues that Commerce's reason for not including newsprint traded in the denominator (i.e., that "the cost of the raw materials supplied by the customer should not be included in the [cost of goods sold] because there was no recognized expense and there is no matching revenue item for those physical raw materials") is flawed.  *See* Kejriwal's Br. 21 (quoting I&D Memo, Comm. 3 at 9).

Kejriwal points out that Commerce included the cost of newsprint traded in the denominator in its calculation of Kejriwal's financial expense ratio because of the unique nature of its business model.  *See* Kejriwal's Br. 24-26.  It believes that this unique nature makes it necessary to allocate company-wide G&A expenses to the company-wide cost of goods sold in both its G&A and financial expense ratios.  Therefore, it asserts that, to "properly account for Kejriwal's business in nonsubject

merchandise, Commerce should have included the cost of newsprint
traded in the denominator of its G&A expense ratio.  There are no
reasonable arguments to justify excluding this cost from
Commerce's calculation."  Kejriwal's Br. 24.

For its part, the Association argues that "Kejriwal proposes
that the Department impute a cost for newsprint that the company
never purchased, never received into inventory, never took title
to, never paid for, and never resold."  *See* Ass'n Resp. Br. 10.
Therefore, it insists: "[T]he Departments's refusal to include
the cost of newsprint in the G&A expense ratio was reasonable and
was supported by the evidence of record . . . ."  *See* Ass'n Resp.
Br. 10.

Commerce argues that it justifiably distinguished its
treatment of the costs of newsprint traded in calculating
Kejriwal's financial expense and G&A expense ratio because

> Commerce found that the financial expense for
> the traded newsprint was necessary due to
> "unusual facts in this case where the purpose
> of the allocation ratio is thwarted because
> of the structure of the newsprint
> transactions.  Thus, it is appropriate to
> allocate the financing expenses of the
> company as a whole to both the cost of goods
> manufactured directly by Kejriwal and the
> cost of the goods traded."  For G&A expenses,
> on the other hand, Commerce found that the
> "cost of the raw materials supplied by the
> customer should not be included in the [cost
> of goods sold] because there was no
> recognized expense and there is no matching
> revenue item for those physical raw
> materials."  Thus, Commerce did not

"include[] the cost of newsprint in the [cost
of goods sold] but instead reclassified
certain newsprint operation direct expenses
from G&A expense to cost of newsprint revenue
and included those expenses in the
denominator of the G&A expense ratio
calculation."  This division is reasonable
given the "unique" facts and division between
financial expense, which applied to all of
the newsprint, and G&A, which did not involve
the raw materials for the newsprint.

Def.'s Br. 29 (quoting I&D Memo, Comms. 2-3) (internal citations omitted).  Thus, the Department maintains that it made the necessary adjustments to give a fair picture of Kejriwal's business.  As a result, Commerce asks the court to sustain its decision because, it insists, the decision was justified, fully explained, and within its discretion.  *See* Def.'s Br. 28-29.

Commerce must calculate as accurate a constructed value as possible, including therein its calculation of general and administrative expenses.  *See Thai I-Mei Frozen Foods Co. v. United States*, 32 CIT __, __, 572 F. Supp. 2d 1353, 1359 (2008) ("Commerce must be guided by the objectives of achieving an accurate margin and a fair comparison between export price and normal value.").  Commerce is further required to calculate costs based on a respondent's reasonably reflective records and "consider all available evidence on the proper allocation of costs . . . ."  *See* 19 U.S.C. § 1677b(f)(1)(A).  The statute provides no further guidance and therefore Commerce is afforded certain discretion in calculating G&A expenses.

Having reviewed the record, the court finds that Commerce's explanation of its construction of the G&A expense ratio is inadequate. Therefore, it must be remanded for reconsideration. Here, Commerce verified that the majority of Kejriwal's G&A expenses are associated with its newsprint operations, but allocated the majority of such expenses to its CLPP business. As Kejriwal explains, and the record confirms, Kejriwal had approximately 60 suppliers and customers of newsprint and fewer than five CLPP customers. Further, six and one-half out of Kejriwal's seven offices were dedicated to newsprint trading, as were most of its employees. *See* Kejriwal Br. 19-20 (citing Verification Report at 8-11, Ex. 4 at 2. This being the case, the Department has failed to explain how it is reasonable to include overhead expenses associated with Kejriwal's newsprint business in the numerator and not include some appropriate corresponding value in the denominator. In addition, the court's comparison of Kejriwal's profit and loss account for the year ending March 31, 2004, before the POR and before Kejriwal started its CLPP operation, with that for the year ending March 31, 2005, further reveals that the large majority of Kejriwal's G&A expenses were associated with newsprint trading, i.e., non-subject merchandise.[14] Nevertheless, Commerce's calculation does

---

[14] Kejriwal's profit and loss account for the year ending March 31, 2004, before the POR and before Kejriwal started its
(continued...)

not seem to account for this in allocating G&A expenses to subject merchandise, and therefore does not give a fair picture of the company's business.

Given these findings, the court cannot conclude that Commerce's analysis was reasonable. Accordingly, this matter is remanded to Commerce for it to reconsider Kejriwal's G&A expense ratio calculation in a manner comporting with this opinion. On remand, the agency is directed to account for Kejriwal's cost of newsprint traded (or some fair equivalent value) in the denominator of the ratio of its G&A expense ratio calculation, and recalculate Kejriwal's G&A expenses allocated to Kejriwal's subject merchandise. Alternatively, Commerce is directed to explain in detail how its treatment of Kejriwal's G&A expense ratio fairly allocates G&A expenses between subject and non-subject merchandise. Commerce shall make specific reference to the record evidence demonstrating that, as reported in footnote 14, the majority of Kejriwal's G&A expenses are associated with its newsprint operations. This includes, but is not limited to, the number of Kejriwal's offices, employees, suppliers, and customers dedicated to its newsprint business, as compared to its

---

[14](...continued)
CLPP operation, reported approximately [[                    ]] as G&A expenses. For the year ending March 31, 2005, covering most of the POR and including the start-up CLPP business, Kejriwal reported approximately [[                    ]] as G&A expenses. *See* Verification Report, Ex. 1 at 14.

CLPP operation.  The Department shall further explain how its G&A

expense ratio calculation is consistent with its treatment of

Kejriwal's financial expense ratio and with the overarching

purpose of calculating as accurate a dumping margin as possible.


CONCLUSION

For the reasons stated, Commerce's final results of

administrative review are sustained in part and remanded.  Remand

results are due on or before January 16, 2009.  Comments to the

remand results are due on or before February 16, 2009.  Replies

to such comments are due on or before March 2, 2009.


                                    /s/ Richard K. Eaton
                                      Richard K. Eaton

 Dated: November 17, 2008
        New York, New York