Slip Op. 11- **123**

UNITED STATES COURT OF INTERNATIONAL TRADE

|  |  |
|---|---|
| FOSHAN SHUNDE YONGJIAN HOUSEWARES & HARDWARE CO. LTD., | : <br> : <br> : <br> : |
| and | : Before: Richard K. Eaton, Judge <br> : <br> : Court No. 10-00059 |
| POLDER, INC., | : <br> : |
| Plaintiffs, | : <br> : |
| v. | : <br> : |
| UNITED STATES, | : <br> : |
| Defendant, | : <br> : |
| and | : <br> : |
| HOME PRODUCTS INTERNATIONAL, INC. | : <br> : <br> : |
| Defendant-Intervenor. | : <br> : |

## OPINION AND ORDER

[Plaintiff's motion for judgment on the agency record granted, in part, and the matter is remanded.]

Dated: October 12, 2011

*Dorsey & Whitney LLP* (*William E. Perry* and *Elizabeth Crouse*), for plaintiffs Foshan Shunde Yongjian Housewares & Hardware Co., Ltd. and Polder, Inc.

*Tony West,* Assistant Attorney General; *Jeanne E. Davidson,* Director, Patricia M. McCarthy, Assistant Director, Commercial Litigation Branch, Civil Division, United States Department of Justice (*Michael D. Snyder*); Office of Chief Counsel for Import Administration, U.S. Department of Commerce, *Thomas M. Beline,* of counsel, for defendant.

*Blank Rome LLP* (*Frederick L. Ikenson, Peggy A. Clarke,* and *Larry Hampel*), for defendant intervenor Home Products

Eaton, Judge:  Before the court is plaintiffs' motion for judgment on the agency record, challenging the Department of Commerce's ("Commerce" or the "Department") final results of the Fourth Administrative Review of the antidumping duty order on Floor Standing Metal-Top Ironing Tables and Certain Parts Thereof from the People's Republic of China, 75 Fed. Reg. 3, 201 (Dep't of Commerce Jan. 20, 2010) (final results of administrative review) and the accompanying Issues and Decision Memorandum ("Issues & Dec. Mem.") (collectively, the "Final Results") for the period of review ("POR") August 1, 2007 through July 31, 2008.  *See* Plaintiff's Mem. of Pts. & Auths. in Supp. of Pls.' Mot. J. on the Agency R. ("Pls.' Mem.) 2.

The court has jurisdiction pursuant to 28 U.S.C. § 1581(c) (2006).  For the reasons set forth herein, the Final Results are sustained, in part, and this matter is remanded to the Department for further proceedings.


## BACKGROUND

Plaintiff Foshan Shunde Yongjian Housewares & Hardware Co., Ltd. ("Foshan Shunde") is a producer and exporter of ironing boards from the People's Republic of China ("PRC").  Plaintiff Polder, Inc. ("Polder") is a domestic importer of ironing boards from the PRC.  Ironing boards exported by Foshan Shunde to the

United States, and imported by Polder, are covered by the antidumping order on ironing boards from the PRC. *See* Notice of Floor-Standing, Metal-Top Ironing Tables and Certain Parts Thereof from the PRC, 69 Fed. Reg. 47,868 (Dep't of Commerce Aug. 6, 2004) (amended final determination of sales at less than fair value and antidumping duty order) (the "Order").

On August 1, 2008, Commerce published a notice of opportunity for interested parties to request a fourth administrative review of the Order. On August 29, 2008, pursuant to 19 C.F.R. § 351.213(b)(2) (2011), defendant-intervenor Home Products International, Inc. ("HPI" or "defendant-intervenor") asked for a review of ironing board sales made by Foshan Shunde. On that same date, Foshun Shunde requested a review of its own sales.

The Department issued the preliminary results of its administrative review on September 8, 2009. *See* Floor-Standing, Metal-Top Ironing Tables and Certan Parts Thereof from the PRC, 74 Fed. Reg. 46,083 (Dep't of Commerce Sept. 8, 2009) (preliminary results of antidumping duty administrative review) (the "Preliminary Results"). In the Preliminary Results, the Department found that Foshun Shunde's "unreliable and inconsistent" responses to questionnaires concerning the company's factors of production and sales data warranted the application of adverse facts available ("AFA") to all of the

company's questionnaire responses when determining its dumping

margin.[1]  *Id.* at 46,085; 19 U.S.C. § 1677e(b) (2006).

Commerce further found that Foshan Shunde was not entitled

to separate-rate status,[2] concluding that "because the Department

determine[d] that Foshan Shunde's responses [were] unreliable and

inconsistent, . . . Foshan Shunde has not demonstrated that it

operates free from government control."  Preliminary Results, 74

---

[1]      The dumping duty margin is "the amount by which the normal price exceeds the export price or constructed export price of the subject merchandise." 19 U.S.C. § 1677(35)(A).  If the price of an item in the home market (normal value) is higher than the price for the same item in the United States (export price), then the dumping margin comparison produces a positive number that indicates dumping has occurred.

[2]      Whether Foshan Shunde is entitled to separate-rate status is an issue because the company operates in the PRC, which is a non-market economy country.  A non-market economy country includes "any foreign country that the administering authority [Commerce] determines does not operate on market principles of cost or pricing structures, so that sales of merchandise in such country do not reflect the fair value of the merchandise."  19 U.S.C. § 1677(18)(A); *Shandong Huarong Gen. Group Corp. v. United States*, 28 CIT 1624, 1625 n.1 (2004) (not reported in the Federal Supplement).  "Any determination that a foreign country is a nonmarket economy country shall remain in effect until revoked by the administering authority."  19 U.S.C. § 1677(18)(C)(i).  The PRC has been determined to be a non-market economy country and has been treated as such in all past antidumping investigations. *Zhejiang Native Produce & Animal By-Products Imp. & Exp. Corp. v. United States*, 27 CIT 1827, 1834 n.14 (2003) (not reported in the Federal Supplement) (citations omitted).

When an exporter operates in a non-market economy country Commerce presumes it to be part of a country-wide entity controlled by that country's government.  If that exporter can establish that it operates free from government control, however, it is entitled to have its own "separate-rate" based on its own factors of production and sales data, or if AFA is applicable, by an acceptable method.

Fed. Reg. at 46,085.  As it has done here, Commerce commonly refers to its determination to apply AFA to the totality of a respondent's submissions as "total AFA."[3]

After receiving comments from plaintiffs and defendant-intervenor, the Department issued the Final Results on January 20, 2010.  In the Final Results, Commerce made no changes to its Preliminary Results and, thus, applied "total AFA" to Foshan Shunde's questionnaire responses, retained its determination that the company was not entitled to a separate rate, and assigned the PRC-wide antidumping duty margin of 157.68%.  *See* Final Order, 75 Fed. Reg. at 3,202; Issues & Dec. Mem. at 23-24.

Plaintiffs, by their motion, challenge two aspects of the Final Results.  First, they make a pair of related claims: (1) that the Department's determination to apply AFA to Foshan Shunde's factors of production and sales data was in error; and (2) that, should they fail in their effort to have the AFA determination found unlawful, the Department should be directed to apply only partial AFA.  Second, plaintiffs challenge Commerce's denial of separate-rate status to Foshan Shunde, and

---

[3]  While the phrase "total AFA" is not referenced in either the statute or the agency's regulations, it can be understood, within the context of this case, as referring to Commerce's application of the "facts otherwise available" and "adverse inferences" provisions of 19 U.S.C. § 1677e after rejecting as untrustworthy all information submitted by respondents in this review.

the resulting assessment of the PRC-wide antidumping rate of 157.68%.

STANDARD OF REVIEW

The standard of review is set forth in 19 U.S.C. § 1516a(b)(1)(B)(i), which provides, in relevant part, that the court "shall hold unlawful any determination, finding, or conclusion found . . . to be unsupported by substantial evidence on the record or otherwise not in accordance with law." Accordingly, "Commerce's determinations of fact must be sustained unless unsupported by substantial evidence in the record and its legal conclusions must be sustained unless not in accordance with law." *Norsk Hydro Canada, Inc. v. United States*, 472 F.3d 1347, 1357 (Fed. Cir. 2006).

DISCUSSION

I.  Commerce's AFA Determination on Factors of Production and Sales Data

    A.  Legal Framework for Applying AFA

Commerce is charged with administering the antidumping laws, which includes carrying out the "overriding purpose of . . . calculat[ing] dumping margins as accurately as possible." *Parkdale Int'l v. United States*, 475 F.3d 1375, 1380 (Fed. Cir. 2007). The Department generally makes its antidumping determinations based on the information it solicits and receives

from interested parties concerning the normal value and export

price of the subject merchandise.

The Department may, however, rest its determinations on

"facts otherwise available . . . 'to fill in the gaps' when

'Commerce has received less than the full and complete facts

needed to make a determination'" from the respondents.  *Gerber*

*Food (Yunnan) Co., Ltd. V. United States*, 29 CIT 753, 767, 387 F.

Supp. 2d 1270, 1283 (2005) ("*Gerber I*") (quoting *Nippon Steel*

*Corp. v. United States*, 337 F.3d 1373, 1381 (Fed. Cir. 2003)).

Pursuant to 19 U.S.C. § 1677e(a):

> If--
>
> (1) Necessary information is not available on the
> record, or
>
> (2) an interested party or any other person–
>
>> (A) withholds information that has been
> requested by the [Department] under this subtitle,
>
>> (B) fails to provide such information by the
> deadlines for submission of the information or in the
> form and manner requested, subject to subsections
> (c)(1) and (e) of [19 U.S.C. § 1677m(c)(1) and (e)],
>
>> (C) significantly impedes a proceeding under
> this subtitle, or
>
>> (D) provides such information but the
> information cannot be verified as provided in section
> 1677m(i) of this title,
>
> the [Department] shall, subject to [19 U.S.C. §
> 1677m(d)], use the facts otherwise available in
> reaching the applicable determination . . . .

Pursuant to the language of the statute, Commerce's authority to

apply facts otherwise available is circumscribed by § 1677m(d).

Under § 1677m(d), when Commerce "determines that a response to a request for information under this subtitle does not comply with the request," it must "promptly inform the person submitting the response of the nature of the deficiency and shall, to the extent practicable, provide that person with an opportunity to remedy or explain the deficiency."  If further information is submitted and "(1) [Commerce] finds that such response is not satisfactory, or (2) such response is not submitted within the applicable time limits, then [Commerce] may, subject to [section 1677m(e)], disregard all or part of the original and subsequent responses."  19 U.S.C. § 1677m(d).

The Department's use of facts otherwise available, therefore, generally requires that Commerce (1) find that the response to a request for information is deficient; (2) provide, when practicable, an opportunity to the party submitting the information to explain or correct the deficiency; and (3) determine whether such explanation or correction is either unsatisfactory or untimely.  Each of these determinations must be supported by substantial evidence on the record.  *See Gerber Food (Yunnan) Co. v. United States*, 31 CIT 921, 931, 491 F. Supp. 2d 1326, 1337 (2007) ("*Gerber II*").

Once Commerce determines that the use of facts otherwise available is warranted, pursuant to § 1677e(b), if the Department

further "finds that an interested party has failed to cooperate by not acting to the best of its ability to comply with a request for information," it "may use an inference that is adverse to the interests of that party in selecting from among the facts otherwise available."  19 U.S.C. § 1677e(b).  As the Court of Appeals for the Federal Circuit has explained:

> subsection (b) [of § 1677e] permits Commerce to "use an inference that is adverse to the interest of [a respondent] in selecting from among the facts otherwise available," only if Commerce makes the separate determination that the respondent "has failed to cooperate by not acting to the best of its ability to comply."  The focus of subsection (b) is respondent's *failure to cooperate to the best of its ability*, not its failure to provide requested information.

*Nippon Steel*, 337 F.3d at 1381.  Accordingly, Commerce may only apply AFA if it determines that (1) the use of facts otherwise available is warranted under §§ 1677e(a) and 1677m, and (2) a respondent has failed to cooperate to the best of its ability under § 1677e(b).  A respondent fails to act to "the best of its ability" if it fails to "do the maximum it is able to do." *Nippon Steel*, 337 F.3d at 1382.  In selecting an AFA rate, the Department may rely on secondary information, including "(1) the petition, (2) a final determination in the investigation under this subtitle, (3) any previous review under [19 USCS § 1675] or determination under [19 USCS § 1675b], or (4) any other information placed on the record."  19 U.S.C. § 1677e(b).

B. Commerce's Determination to Apply AFA to Foshan Shunde's Factors of Production and Sales Data in the Final Results

According to Commerce, "[t]hroughout this proceeding, the Department has been concerned that Foshen Shunde has failed to provide the most specific calculation of its factors of production permitted by its accounting and production records." Memorandum re Use of Adverse Facts Available, A-570-888 (Dep't of Commerce August 31, 2009) (C.R. Doc. 19) ("AFA Memo") at 2. The Department was particularly concerned that Foshan Shunde was not providing complete answers to the questions relating to the amount of each input used in producing its various models of ironing boards, and that it did not provide specific information regarding its use of hot-rolled and cold-rolled steel inputs. Issues & Dec. Mem. at 19-20.

In response to Commerce's initial questionnaire, Foshan Shunde, as it had done in the First Administrative Review, reported its factors of production inputs using a "weight-based" methodology. The purpose of the "weight-based" allocation methodology was to assign manufacturing costs incurred by Foshan Shunde on a range of subject and non-subject products, including merchandise such as "ashtrays, ladders, trolleys, racks, trash cans, sleeve racks and other ironing board accessories." Issues & Dec. Mem. at 12. Employing this methodology, Foshan Shunde simply divided all of its inputs, including rolled steel, by weight among all of the products it produced, and then multiplied

these weights by the cost per kilogram of each input.  Thus, this
method provided an estimate of its production costs by product
line, but provided no specific information for each model of
ironing board.  Although the Department had accepted this method
of calculating input quantity and cost in the First
Administrative Review, here, it chose to ask more specific
questions.  *See* Issues & Dec. Mem. at 12.

To gather this information, the Department issued multiple
supplemental questionnaires by which it sought to elicit from
Foshan Shunde "information with as much specificity as possible."
AFA Memo at 2-3; *see, e.g.,* First Supplemental Questionnaire, A-
570-888 (Dep't of Commerce Feb. 10, 2009) (C.R. Doc. 5) ("First
Supplemental Questionnaire") 2; Second Supplemental
Questionnaire, A-570-888 (Dep't of Commerce Apr. 16, 2009)
("Second Supplemental Questionnaire") (C.R. Doc. 8) 1-2.  When
the answers to the first three supplemental questionnaires did
not produce the sought after information, Commerce issued the
Fourth Supplemental Questionnaire.  Finally, in response to
Commerce's Fourth Supplemental Questionnaire, Foshan Shunde
produced a sample of its production notes.  Response of Foshan
Shunde to the Department's Fourth Supplemental Questionnaire, A-
570-888 (Dep't of Commerce August 10, 2009) (C.R.  Doc. 16)
("Fourth Supplemental Questionnaire Response").  Commerce
determined that these production notes, at least with respect to

the ironing board models for which they were actually supplied, provided a better indication of the quantity of each input actually used in manufacturing Foshan Shunde's merchandise than the weight-based method had.  This is because the production notes broke the inputs down by part (e.g., wire mesh, left/right rail) and by material (e.g., plate, tube, wire).

Ultimately, the Department found that full disclosure of the production notes would have cleared up the uncertainty created by the weight-based calculation.  Issues & Dec. Mem. at 13 (quoting AFA Memo at 6) ("Foshan Shunde's 'production notes' . . . 'set forth model-specific usage rates for each of Foshan Shunde's material inputs, including the critical inputs of flat-rolled steel.  With these production notes, Foshan Shunde could have furnished the Department with more specific costs and factors of production than that which it provided.'").  Because, in its view, Foshan Shunde had not produced the notes in a timely fashion, and had provided only a small sample of its notes in response to the Fourth Supplemental Questionnaire, the Department determined that the company had not acted to the best of its ability in providing this necessary information.  AFA Memo at 5-6; Issues & Dec. Mem. at 20.  In reaching this conclusion, Commerce stated:

> The most significant obstacle to accepting Foshan
> Shunde's non model specific costs are the 'production
> notes' which Foshan Shunde provided at exhibit 3 of its
> August 10, 2009 submission [in response to the Fourth

> Supplemental Questionnaire]. . . . [T]hose production
> notes set forth model-specific usage rates for each of
> Foshan Shunde's material inputs, including the critical
> inputs of flat-rolled steel.  With these production
> notes, it is apparent that Foshan Shunde could have
> furnished the Department with more specific costs and
> factors of production than what it provided.

AFA Memo at 6.  Commerce, thus, concluded that the "existence of

such 'production notes' undercut the accuracy and reliability of

previous Foshan Shunde submissions," and "Foshan Shunde's partial

disclosure of its 'production notes' at a late point in this

proceeding constitutes a failure on Foshan Shunde's part to

cooperate to the best of its ability and as significantly

impeding this proceeding within the meaning of [§ 1677e]."

Issues & Dec. Mem. at 13-14.  In other words, according to

Commerce, the production notes show that Foshan Shunde could have

been more specific in its answers to the Department's

questionnaire at a much earlier stage in the proceedings, but did

not "do the maximum it [was] able to do" to produce them.  *Nippon

Steel*, 337 F.3d at 1382.

Next, while the failure to provide the production notes is

the primary reason for the Department's determination to apply

AFA to the factors of production information provided by Foshan

Shunde, Commerce had others.  In the Final Results, the

Department also found that "Foshan Shunde provided incomplete and

unreliable information concerning . . . its inputs of hot and

cold rolled steel."  Issues & Dec. Mem. at 19.  In response to

Commerce's initial questionnaire, Foshan Shunde claimed to use hot-rolled steel for the legs of the ironing boards and cold-rolled steel for the tops.  Because the surrogate value of hot-rolled steel is less than that for cold-rolled steel, according to Commerce, Foshan Shunde had an incentive to report inputs of the former, which would result in a lower normal value calculation.  *See* AFA Memo at 2; *see also* 19 U.S.C. § 1677b(c). Petitioner HPI, however, provided evidence, in the form of a 1990 report on carbon and alloy steels in the PRC (the "Steel Report"), that suggested that hot-rolled steel was not available in the PRC in the size and form required to manufacture ironing boards.  In addition, HPI provided a metallurgical analysis of an ironing board from the PRC, purchased in the United States (the "Metallurgical Analysis"), which showed that hot-rolled steel was not used in their manufacture.  Because the Department found that the Steel Report and the Metallurgical Analysis called the accuracy of Foshan Shunde's original questionnaire responses into question, it requested additional information from the company concerning the types and quantities of steel purchased for its specific ironing board models.

When asked for more detail about the steel it used, however, Foshan Shunde claimed that it could not specify the type and quantity of steel purchased for different models of ironing boards because its "customers decide the thickness and type of

steel used."  AFA Memo at 6 (quoting Response of Foshan Shunde to the Department's Second Supplemental Questionnaire, A-570-888 (Dep't of Commerce May 1, 2009) ("Second Supplemental Questionnaire Response") 2).  While not entirely clear, it appears that the company was claiming that there were no standard ironing board models, and that the quantity and type of materials used for each model of ironing board it produced varied with the specifications of its individual customers.  Seemingly, this response was Foshan Shunde's effort to convince Commerce that it was somehow unable to report its own manufacturing inputs because they were dictated by the ironing board purchasers.

In response to Commerce's request for samples of the company's correspondence with these customers, however, "Foshan Shunde provided a single photograph which it represented to be indicative of the correspondence it received from its customers concerning the steel inputs used in the manufacture of subject merchandise."  Issues & Dec. Mem. at 13.  Upon further inquiry by the Department, Foshan Shunde "provided portions of customer e-mails without explaining why it kept those portions and not those the Department explicitly requested."  Issues & Dec. Mem. at 13.  Moreover, Foshan Shunde produced some product diagrams, but these omitted information concerning the type of steel used.  Nor were these diagrams translated in their entirety, as required by

regulation.  *See* AFA Memo at 3.[4]

Ultimately, Commerce did not draw any conclusion as to what type of steel Foshan Shunde used.  Rather, it determined that, because the company's responses lacked specificity and credibility, they provided additional evidence that Foshan Shunde's factors of production responses should be disregarded and AFA should be employed.

Plaintiffs contend that Commerce based its determination that Foshan Shunde failed to cooperate to the best of its ability by failing to fully report the type of steel it used on the Steel Report and the Metallurgical Analysis provided by HPI.  Pls.' Mem. 16.  For plaintiffs, these documents fail to demonstrate what type of steel Foshan Shunde used to manufacture ironing boards because the Steel Report did not take into account that the Chinese manufacturing sector "has grown and evolved exponentially since 1990," and the Metallurgical Analysis was "conducted on an ironing table which did not identify the ironing table as manufactured by Foshan Shunde and [was] purchased by

---

[4]     Pursuant to 19 C.F.R. § 351.303(e):

A document submitted in a foreign language must be accompanied by an English translation of the entire document or of only pertinent portions, where appropriate, unless the Secretary waives this requirement for an individual document.  A party must obtain the Department's approval for submission of an English translation of only portions of a document prior to submission to the Department.

[HPI] seven months after the end of the review period."  Pls.'
Mem. 16-17.

Plaintiffs' claim that the Department based its
determination on the Steel Report and Metallurgical Analysis,
however, is not supported by the record.  With regard to Foshan
Shunde's questionnaire responses concerning steel inputs, the
Department found:

> In analyzing Foshan Shunde's steel inputs, we have
> focused primarily upon the reliability of the
> information submitted by Foshan Shunde rather than upon
> the [Metallurgical Analysis] submitted by Petitioner or
> other information concerning the overall state of the
> steel industry in China.  Review of record evidence
> indicates that there are both (1) significant cost
> differences between the surrogate values of hot and
> cold rolled steel and (2) *that Foshan Shunde has
> provided conflicting information concerning the type of
> steel that it utilizes in production of the subject
> merchandise.*

Issues & Dec. Mem. at 20 (emphasis added).  Thus, while the
Metallurgical Analysis and the Steel Report no doubt heightened
the Department's awareness of possible problems with Foshan
Shunde's questionnaire responses, it is apparent that the
responses themselves (i.e., incomplete emails, omitted
information concerning steel type, inadequate translation) led to
Commerce's determination to disregard the factors of production
questionnaire responses.  That is, the determination that Foshan
Shunde failed to cooperate to the best of its ability was based
on the company's failure to provide complete and credible
responses to Commerce's questionnaires, and took into

consideration the significant cost differences between hot- and cold-rolled steel.

Commerce found further evidence to justify its application of AFA in Foshan Shunde's answers to questions relating to the source of steel wire.  In its questionnaire responses, Foshan Shunde represented that the company made steel rod into the wire it used in making its ironing boards, rather than purchasing finished steel wire from outside sources.  In the Final Results, Commerce found that there was conflicting evidence as to the source of the steel wire and, thus, "Foshan Shunde also withheld information regarding its source of steel wire, another key input."  Issues & Dec. Mem. at 14.  Plaintiffs contend that, contrary to Commerce's findings, "Foshan Shunde's evidence about its wire drawing operations is not contradictory."  Pls.' Mem. 19.

Foshan Shunde initially reported that it internally drew steel rod into the wire used in the production of subject merchandise.  But, according to Commerce, in the investigation of Kitchen Appliance Shelves and Racks from the PRC (the "KASR Investigation"), in which Foshan Shunde's affiliate Guangdong Wireking was a respondent, Foshan Shunde's personnel reported that it "performed no wire drawing but rather purchased finished wire from an outside supplier."  AFA Memo at 4; Wireking Verification Report at Attachment 2 (C.R. Doc. 13).

When this apparent contradiction was brought to the company's attention by the Department, Foshan Shunde claimed, for the first time, that it had sold its wire drawing equipment during the POR. For plaintiffs, the evidence it placed on the record demonstrates that Foshan Shunde must have had its own wire drawing equipment because it purchased wire rod that was larger than the wire used in the manufacture of the subject merchandise. In addition, plaintiffs insist that two Foshan Shunde employees operated the wire drawing machinery, and the company provided tax documents purporting to show that the wire drawing equipment had been sold. Pls.' Mem. 19-22.

Despite plaintiffs' disclosure, the Department asserts that it did not err in using Foshan Shunde's responses as evidence supporting the application of AFA. Issues & Dec. Mem. at 14 ("Foshan Shunde did not report the sale of production equipment relating to its wire drawing operation until August 13, 2009 and only then did so after repeated requests from the Department. Further, on August 27, 2009, at a point still later in the proceeding, Foshan Shunde provided other supporting documentation concerning the production and source of its long-wire products. . . . Foshan Shunde's failure to disclose this information earlier in the proceeding has significantly impeded the Department's analysis of Foshan Shunde's long-wire inputs . . . ."); AFA Memo at 7 ("[I]n its August 10, 2009 submission, Foshan Shunde offered

no documentation of the sale or to whom the equipment was sold. Moreover, there is no mention of the sale of Foshan Shunde's wire drawing operation in the KASR verification report.  Based on the foregoing, we preliminarily find Foshan Shunde's narrative concerning its [wire drawing] operation to lack credibility.").

In addition to asserting that the inadequacy of Foshan Shunde's factors of production responses supported the use of AFA, Commerce determined that the sales data provided by Foshan Shunde was also unreliable.  On November 18, 2008, in response to Commerce's initial questionnaire, Foshan Shunde indicated that it "was not affiliated with any producers or exporters of the subject merchandise during the POR."  *See* AFA Memo at 7 (citations omitted).  The Department required the disclosure of information relating to the other companies in order to identify all relevant sales by Foshan Shunde, and to allow the agency to accurately calculate the U.S. export price of the ironing boards. Issues & Dec. Mem. 14; *see also* 19 U.S.C. § 1677a(a) (defining export price).  In the Final Results, however, Commerce determined that Foshan Shunde provided conflicting information concerning its affiliation with another company, Shunde Junbang.

The Department found that "the statements made by Foshan Shunde in this review are inconsistent with the statements made by Foshan Shunde personnel in the [KASR Investigation].  During the course of the KASR investigation, [which was virtually

simultaneous with this investigation,] Shunde Junbang indicated that it listed ironing boards on its website and forwarded customer inquiries to Foshan Shunde." Issues & Dec. Mem. at 21 (quoting AFA Memo at 7) (citations omitted). In addition, Commerce found that the product codes for ironing boards listed on Foshan Shunde's and Shunde Junbang's respective web sites were similar. Accordingly, the Department determined that "the commonality of product codes between the merchandise sold by Foshan Shunde and the merchandise sold by Shunde Junbang indicates the latter may have in fact sold Foshan Shunde merchandise." Issues & Dec. Mem. at 21.

Commerce found Foshan Shunde's explanations of these findings unconvincing. For example, the company attributed the similarity in the product codes of its products and those listed by Shunde Junbang to a uniform similarity in product codes across the ironing board industry. *See* AFA Memo at 7 (citing Letter from Foshan Shunde, dated August 10, 2009 at 3). The Department, however, found that, based on evidence submitted by defendant-intervenor, only Foshan Shunde's and Shunde Junbang's web sites bore similar product codes. AFA Memo at 7. In other words, Commerce determined that the similarity in the product codes for ironing boards sold on Foshan Shunde's and Shunde Junbang's respective web sites indicated that Shunde Junbang was, in fact, selling subject merchandise on behalf of Foshan Shunde.

Based on these findings, the Department concluded that "[d]espite the opportunities afforded to the company to clarify the conflicting accounts played by Shunde Junbang in the sale of the subject merchandise, significant discrepancies remain between the account that Foshan Shunde rendered of Shunde Junbang activities in this proceeding and the account that Foshan Shunde offered in the [KASR] investigation." Issues & Dec. Mem. at 21. Accordingly, Commerce found that Foshan Shunde's questionnaire responses concerning its affiliation with Shunde Junbang were unreliable and, therefore, constituted substantial evidence supporting the application of AFA to Foshan Shunde's sales data.

Plaintiffs do not contest the Department's determination to apply AFA to its sales data. Rather, they object that, even if Foshan Shunde's failure to explain its relationship with Shunde Junbang "rises to the level of misconduct, the Department is still not empowered to use total adverse facts available for an entire investigation on that basis alone." Pls.' Mem. 35. As discussed *infra*, the Department's determination to apply AFA to all of Foshan Shunde's factors of production and sales data was reasonable on the record before it.

C.  Commerce's Determination to Apply AFA to Foshan Shunde's Factors of Production and Sales Data is Sustained

Commerce has some discretion to decide what information it needs to accurately calculate a respondent's dumping margin. *See*

*Guangdong Chems. Imp. & Exp. Corp. v. United States*, 30 CIT 85, 96, 414 F. Supp. 2d 1300, 1310 (2006) ("Commerce is given wide discretion in the selection of data sources for use in administrative review."). The Department makes its decision as to the information it needs and implements it by requesting such information through its questionnaires. Respondents have an obligation to act to the best of their ability to provide the requested information. *See* 19 U.S.C. 1677e(b).

In this case, Commerce reasonably determined that the record was incomplete because Foshan Shunde did not provide adequate information concerning the quantity of materials and the nature of the steel actually used in producing the subject merchandise. Additionally, the company did not timely produce information relating to the source of its steel wire inputs. This information was necessary to determine the surrogate values of these materials in order to calculate the normal value of Foshan Shunde's merchandise. Accordingly, the absence of this information created a gap in the record that warranted the use of facts otherwise available under 19 U.S.C. § 1677e(a).

Moreover, Commerce's determination that Foshan Shunde's failure to provide this information in a timely fashion supported the application of AFA was reasonable. First, by withholding the production notes, Foshan Shunde did not cooperate to the best of its ability in responding to Commerce's questionnaires seeking

the specifics of its manufacturing inputs.  That is, while it may have been reasonable for Foshan Shunde to reply to the initial questionnaire using the same methodology it used in the First Review, it was not reasonable for the company to fail to produce the production notes in response to the supplemental questionnaires.  *See, e.g.,* First Supplemental Questionnaire, Sec. D(1) ("For each model of the subject merchandise, separately detail the grade of steel and dimensions (length, width and thickness) of every hot-rolled or cold-rolled coil used in the production process . . . ."); Second Supplemental Questionnaire, Sec. D(7)(a) ("Provide the source documentation for models 1454TC2-25 and 1454TC1-28 which support the listed standard weights."); Third Supplemental Questionnaire, A-570-888 (Dep't of Commerce July 27, 2009) (C.R. Doc. 11) Sec. D(4) ("[P]rovide any and all accounting and production records . . . that establish the claimed amount of production material for each of the following inputs for . . . [list of cold- and hot-rolled inputs of various thicknesses].").  Accordingly, the Department did not err in concluding that "Foshan Shunde's partial disclosure of its 'production notes' at a late point in this proceeding constitutes a failure on Foshan Shunde's part to cooperate to the best of its ability and as significantly impeding this proceeding."  *See* Issues & Dec. Mem. at 14.

This conclusion is further supported by Foshan Shunde's

failure to provide adequate responses to Commerce's questions concerning the type of steel used in making the ironing boards. As noted *supra*, Commerce consistently asked questions about the use of hot-rolled and cold-rolled steel in its supplemental questionnaires. Foshan Shunde insisted that this information was unavailable because its customers directed the type of steel used in a particular ironing board model. The company, however, did not produce any credible evidence to support this claim. AFA Memo at 6 ("Foshan Shunde failed to provide any correspondence from its customers to demonstrate that the customer, in fact, specifie[d] the type of thickness of steel materials used. Also, in responding to the Department's [] request for supplemental information, Foshan Shunde provided no documentation to suggest that customer correspondence governed its acquisition of steel inputs."); *see Quingdao Taifa Group Co. v. United States*, 33 CIT __, __, 637 F. Supp. 2d 1231, 1239 (2009) ("A reasonable and responsible foreign producer would have known that it must keep and maintain documents such as factory-out slips, production notices, and production subledgers, and [respondent's] officials' efforts to avoid producing the requested documents demonstrates that Taifa failed to put forth maximum efforts to investigate and obtain the documents."). Based on the record, Commerce has supported with substantial evidence its finding that Foshan Shunde did not cooperate to the best of its ability to produce

evidence demonstrating the type of steel used to make subject merchandise.

Although not as substantial as the evidence relating to the production notes and the type of steel used to make the ironing boards, Foshan Shunde's problematic questionnaire responses concerning its source of steel wire also supports the application of AFA. As an initial matter, Commerce found that purchased wire was significantly more costly than drawn wire. Next, despite the company's representation that it made its own steel wire from steel rod, evidence from the parallel KASR Investigation indicated that the wire had been purchased. During verification in the KASR Investigation, the Department confirmed that Foshan Shunde had no wire drawing equipment.

The Department, was correct in finding that the company did not provide a timely explanation for these apparent inconsistencies. As defendant notes,

> Foshan Shunde did not report the sale of production equipment relating to its wire drawing operation until August 13, 2009 [*i.e.*, in response to the Fourth Supplemental Questionnaire] and only then after repeated requests from the Department. Further, on August 27, 2009, at a point still later in the proceeding, Foshan Shunde provided other supporting documentation concerning the production and source of its long-wire production.

Issues & Dec. Mem. at 14.

Thus, the evidence plaintiffs now point to was not supplied until after the Department questioned the accuracy of Foshan

Shunde's questionnaire responses, following the contradictory statements that its employees made during the KASR Investigation. *See* Issues & Dec. Mem. at 21 ("Foshan Shunde's tardiness in providing documentation concerning the disposition of the wire production equipment precluded any analysis that the Department might have undertaken in the *Preliminary Results*"); AFA Memo at 7 ("As in past submissions, Foshan Shunde indicated in its August 10, 2009 letter that it drew wire during the POR.  Yet, when the Department questioned Foshan Shunde about the observations of the [KASR Investigation] verification team, Foshan Shunde indicated that it sold its wire drawing operation in February 2009. Notwithstanding that it was given four previous opportunities to describe its production process, Foshan Shunde's August 10, 2009 submission was the first mention . . . of the sale of its wire drawing operation.").

As a result, the Department found that "Foshan Shunde's narrative concerning its wire drawing operation [lacked] credibility."  AFA Memo at 7; Issues & Dec. Mem. at 20-21.  When confronted with this inconsistency, Foshan Shunde ultimately claimed that it had sold its wire drawing equipment in February 2009.  This claim, however, was first advanced on August 10, 2009, after the Department was well along in drafting the Preliminary Results issued on September 8, 2009.  Based on the sequence of events, and Foshan Shunde's incentive to report that

it made the wire itself, it was reasonable for Commerce to conclude that Foshan Shunde's questionnaire responses were untimely and lacked credibility.

     D.   The Department's Rejection of the Weight-Based Methodology Was Proper

     In addition to their objections to Commerce's findings with respect to Foshan Shunde's questionnaire response, plaintiffs insist that Commerce acted unlawfully by refusing to accept the weighted average calculation used by Foshan Shunde in the First Administrative Review.  For plaintiffs, "this method was good enough for the Department in [the First Administrative Review] in which Foshan Shunde participated, . . . [and] Foshan Shunde's method of production had not materially changed since [the First Review] . . . ."  Pls.' Mem. 31.  Plainitff, therefore, insists that "the Department should use the data which Foshan Shunde calculated using the same method and timely provided to the Department."  Pls.' Mem. 31.  It is, however, clear that Commerce had the authority to ask more specific questions about the inputs that went into manufacturing Foshan Shunde's ironing boards.

     When the Department changes its methodology it "need only show that its methodology is permissible under the statute and that it had good reasons for the new methodology."  *Huvis Corp. v. United States*, 570 F.3d 1347, 1353 (Fed. Cir. 2009).  Here, in order to calculate a more accurate margin, Commerce requested

input information specific to the subject merchandise to obtain a more accurate valuation of Foshan Shunde's input costs.  See *Id.* at 1355 ("Improving accuracy is generally a good reason for a change in methodology.").  Thus, the Department has supplied a good reason for changing its methodology, and plaintiffs make no claim that the more specific questions were not permissible under the statute.

Morever, Commerce's decision to apply AFA was based on Foshan Shunde's failure to provide information it had in its possession, i.e., the production notes, the correspondence with customers, the sale of the wire drawing equipment.  Accordingly, even if Foshan Shunde did have some reasonable expectation that it was not obligated to maintain specific kinds of input data, here, Commerce's decision was based on Foshan Shunde's failure to timely and fully produce records the company actually had. Foshan Shunde's failure to produce this information in the Supplemental Questionnaires, therefore, could not be attributable to reliance on Commerce's prior use of a different methodology. Thus, even though the weight based method may have been "good enough" for the First Administrative Review, Commerce was not prohibited from attempting to calculate a more accurate dumping margin by making more specific inquiries.[5]

_____

        [5]     As noted, under 19 U.S.C. § 1677m(d), Commerce must afford a respondent whose questionnaire responses are deemed
                                                           (continued...)

E.    Commerce's Decision to Apply AFA to All of Foshan
Shunde's Factors of Production and Sales Responses was
Supported by Substantial Evidence and Otherwise in
Accordance with Law.

In the event that the Department's decision to apply AFA to

certain of Foshan Shunde's questionnaire responses is sustained

by the court, plaintiffs argue that Commerce should have applied

AFA to only that portion of its questionnaire responses that were

found wanting.  Therefore, plaintiffs challenge the Department's

determination to reject Foshan Shunde's factors of production and

sales databases in their entirety in determining the dumping

margin.  According to plaintiffs:

> [T]he statute does not authorize the Department to use
> total adverse facts available based solely on its
> finding that Foshan Shunde submitted unreliable and
> incomplete documentation in support of its purchases
> and use of steel inputs, wire-drawing operation, and
> one disputed affiliation. . . . Under the
> circumstances of this case, the statute and judicial
> precedent require that the Department apply partial
> adverse facts available, if anything, and thereby
> limit the application of adverse facts available only
> to information submitted by Foshan Shunde that is
> missing or otherwise incomplete.  It may not reject
> Foshan Shunde's factors of production and U.S. sales
> databases *in toto*.

Pls.' Mem. 9.

In other words, for plaintiff, even if Commerce's

---

[5](...continued)
deficient an opportunity to explain and/or correct the
deficiencies before it can apply AFA.  Here, the Supplemental
Questionnaires afforded Foshan Shunde that opportunity and,
therefore, Commerce complied with its obligation under
§ 1677m(d).

determination to apply AFA was lawful with regard to certain

information, the application of AFA should have been limited to

the specific missing information rather than the totality of

Foshan Shunde's factors of production and sales information.

> In defending its decision, defendant argues that:

> Commerce reasonably concluded that significant
> deficiencies and inconsistencies existed in Foshan
> Shunde's responses regarding inputs (specifically, the
> types and amount of steel used in producing ironing
> tables, and the source of the drawn wire used), as well
> as the role of an affiliate in the sales of the subject
> merchandise.  The proper valuation of inputs and the
> accuracy of information regarding sales of the subject
> merchandise are core issues in determining an anti-
> dumping duty, and given the general problematic nature
> of Foshan Shunde's submissions during the review
> period, it was well within Commerce's discretion to
> determine that partial facts could not be substituted.

Def.'s Mem. 19.

The court finds that the application of AFA to all of Foshan

Shunde's factors of production and sales information is supported

by substantial evidence and otherwise in accordance with law.

*See Gerber II*, 31 CIT at 930-931, 491 F. Supp. 2d at 1337 ("When

construed together, §§ 1677e and 1677m afford Commerce recourse

if a party fails to cooperate by filing initial and subsequent

questionnaire responses that are so unsatisfactory as to support

a finding that the party withheld requested information or

significantly impeded the review proceeding by providing those

responses.  Nevertheless, when invoking facts otherwise available

under § 1677e(a)(2)(A) or (C), Commerce must support with

substantial record evidence its findings that a party withheld requested information or significantly impeded a proceeding.").

As set forth above, Commerce found that Foshan Shunde failed to adequately respond to requests for information concerning its factors of production. Specifically, plaintiff failed to supply the production notes until it responded to the Fourth Supplemental Questionnaire, supplied insufficient information as to the type of steel used, and gave contradictory accounts regarding its source of steel wire. In addition to its findings that Foshan Shunde's factors of production questionnaire responses were deficient, Commerce also found that Foshan Shunde did not act to the best of its ability in providing information regarding the company's sales data. Specifically, Commerce found wanting its answers with respect to its affiliation with Shunde Junbang.

Based on this history, Commerce determined that "[t]hese deficiencies render the entirety of Foshan Shunde's questionnaire responses an unsuitable basis for calculating a margin." Issues & Dec. Mem. at 12. The Department, thus, found that "Foshan Shunde has withheld information requested by the Department and has significantly impeded the conduct of this proceeding" and, therefore, it decided to apply AFA to Foshan Shunde's entire factors of production and sales databases. *See* Issues & Dec. Mem. at 11.

This is not a case where the responses were deficient with respect to a discrete category of information, such that partial AFA would be required. *See, e.g., Krupp Thyssen Nirosta GMBH v. United States*, 24 CIT 666, 672-673 (2000) (not reported in Federal Supplement) ("Commerce may find on remand that it is appropriate to apply partial facts available to fill any gaps in the sales data it could not successfully verify, but it may not disregard the sales data absent evidence in the record that the sales data was fatally tainted by the errors in the computer program."). Rather, in light of the "pervasiveness of the inaccuracies" in Foshan Shunde's questionnaire responses, and because "[s]uch information is core, not tangential," Commerce acted reasonably in determining that the deficiencies in Foshan Shunde's responses were so great that it could not rely on any of the company's factors of production or sales information. *Since Hardware,* 34 CIT at __, Slip Op. 10-108, at 22; *Shanghai Taoen Int'l Trading Co. v. United States,* 29 CIT 189, 199 n.13, 360 F. Supp. 2d 1339, 1348 n.13 (2005) ("This is not a case of partial gaps in the record. Commerce determined that Taoen failed to provide a credible explanation for the inconsistencies between Customs' entry documents and Taoen's questionnaire responses which concerned the identity of suppliers. Such information is core, not tangential, and there is little room for substitution of partial facts. Total facts available is therefore appropriate

because Commerce has no reliable factors of production information with which to calculate Taoen's antidumping margin."); *see also Qingdao Taifa*, 33 CIT at __, 637 F. Supp. 2d at 1239-40.

Here, it is apparent that Foshan Shunde's inadequate and misleading responses involved a substantial portion of the inputs that went into making the ironing boards. In addition, Foshan Shunde's problematic responses concerning its affiliation with a related company undermined the reliability of its sales data. That is, it is clear that Commerce was not in a position to determine if Foshan Shunde reported all of its sales. As this Court has previously held, when Commerce determines that deficiencies and inconsistencies call into question the credibility of the entirety of a respondent's questionnaire responses with regard to its factors of production and sales, Commerce acts reasonably in applying AFA to the totality of those responses and determining a rate without regard to the information contained in the responses. *See Since Hardware*, 34 CIT at __, Slip Op. 10-108 at 22. Accordingly, the Department's application of AFA to all of Foshan Shunde's factors of production and sales submissions is sustained.

II.  Commerce's Denial of Separate-Rate Status to Foshan Shunde

    A. Legal Framework

Where, as here, Commerce conducts an antidumping investigation or review of products from a non-market economy country ("NME") such as the PRC, the Department employs a presumption of state control. *See Huaiyin Foreign Trade Corp. v. United States*, 322 F.3d 1369, 1372 (Fed. Cir. 2003) ("The Department [has] adopted . . . a presumption that the PRC [i]s a nonmarket economy ("NME") country pursuant to 19 U.S.C. § 1677(18)(A), requiring companies desiring an individualized antidumping duty margin to so request and to demonstrate an absence of state control."). Based on this presumption, all producers from the PRC are deemed to be part of one, state-wide entity and, therefore, unless the presumption is rebutted, they are all assigned a country-wide antidumping duty rate.

A producer may rebut this presumption by "affirmatively demonstrat[ing] its entitlement to a separate, company specific margin." *Sigma Corp. v. United States*, 117 F.3d 1401, 1405 (Fed. Cir. 1997) (citation and quotation omitted). If the presumption is successfully rebutted, the Department will determine a company-specific antidumping duty rate.

To demonstrate its entitlement to a separate rate, a producer must establish that it is independent from the country-wide entity by demonstrating the absence of both de jure and de facto government control over its activities. *See Peer Bearing Co.-Changshan v. United States,* 32 CIT __, __, 587 F. Supp. 2d

1319, 1324 (2008); *see also Sparklers from the PRC*, 56 Fed. Reg.
20,588, 20,589 (Dep't of Commerce May 6, 1991).  If a producer
fails to rebut the presumption, Commerce will apply the PRC-wide
rate.  *See Sigma*, 117 F.3d at 1405.


        B. Commerce's Denial of Separate-Rate Status to Foshan
        Shunde is Contrary to Law and Unsupported by Substantial
        Evidence.

     Plaintiffs argue that Commerce erred in applying AFA to deny
Foshan Shunde separate-rate status because "the Department's
findings as to the need to resort to facts available and the
application of adverse inferences were made with respect to
Foshan Shunde's factors of production and sales data and not its
responses to inquiries establishing its entitlement to a separate
rate."  Pls.' Mem. 46.  The court agrees.

      According to the Department, it denied Foshan Shunde
separate-rate status because

        when a respondent in an NME proceeding has failed to
        cooperate to the best of its ability with respect to
        all requests for information and has been assigned a
        margin based on total AFA, established Department
        practice is to determine that the respondent has failed
        to demonstrate that it operates free from government
        control.

Issues & Dec. Mem. at 5.  In other words, Commerce relied upon
its past practice to determine that Foshan Shunde's failure to
cooperate in responding to questionnaires regarding factors of
production and sales necessarily meant that it had failed to

rebut the presumption of government control.  Issues & Dec. Mem. at 5 ("Foshan Shunde's conduct in this review has changed its status from that of a cooperative respondent to that of a respondent which we have determined to be uncooperative and to have impeded the conduct of this proceeding.  Thus, through its actions in this review, Foshan Shunde has called into question its separate rate status.  Indeed because of Foshan Shunde's own conduct . . . the Department is unable to ascertain which part, if any, of Foshan Shunde's submissions are credible and reliable.").

As this Court held in *Shandong Huarong Gen. Group Corp. v. United States*, 27 CIT 1568, 1595-96 (2003) (not reported in Federal Supplement), and subsequently reaffirmed, Commerce may not deny separate-rate status to a respondent by applying AFA based solely upon the unreliability of that respondent's questionnaire responses regarding its factors of production and/or sales data.  *See Qindago Taifa*, 33 CIT at __, 637 F. Supp. 2d at 1240-41 ("Because the PRC-wide rate thus presumes government control, Commerce may not apply the PRC-wide rate as the AFA rate where AFA is warranted for sales and [factors of production] data, but the respondent has established independence from government control"); *Since Hardware*, 33 CIT at __, Slip Op. 10-108, at 16 ("Commerce has found that [respondent's] responses failed to report accurately information, such as prices and

country of origin, for inputs purchased in market economy countries.  The Department, however, made no specific finding that the responses concerning state control were inaccurate. . . .  Consequently, remand is warranted."); *See Shandong Huarong*, 27 CIT at 1594 ("the findings that justified the use of facts available and a resort to adverse facts available with respect to the [respondent's] sales data and factors of production, cannot be used to accord similar treatment to issues relating to the [respondent's] evidence of independence from state control."); *Gerber I*, 29 CIT at 772, 387 F. Supp. 2d at 1287.

Faced with these contrary holdings, Commerce nonetheless insists that it may rely on its "established practice" to deny separate-rate status to respondents that fail to cooperate to the best of their ability.  Issues & Dec. Mem. at 5.  In doing so, the defendant seeks to distinguish this case from those cited by arguing that, "[u]nlike all of those cases, here Commerce made no determination (preliminary or otherwise) regarding Foshan Shunde's entitlement to a separate rate during this review." Def.'s Mem. 27.  It is, indeed, accurate that in each of the prior cases rejecting the approach Commerce has taken here there was a preliminary finding that the respondent had rebutted the presumption of government control, while in this case, Commerce

made no such finding.[6]  *See Qindago Taifa*, 33 CIT at __, 637 F.

Supp. 2d at 1241; *Since Hardware*, 33 CIT at __, Slip Op. 10-108,

at 16; *Gerber I*, 29 CIT at 771, 387 F. Supp. 2d at 1287; *Shandong*

*Huarong*, 27 CIT at 1572.  This distinction, however, does not

justify the Department's use of AFA to deny Foshan Shunde

separate-rate status.  Rather, Commerce's application of AFA to

deny separate-rate status to Foshan Shunde must be remanded

because it is not based on record evidence specific to the

question of whether the company is subject to state control.  *See*

*Gerber I*, 29 CIT at 772, 387 F. Supp. 2d at 1287 (rejecting the

use of AFA to find government control where "Commerce neither

cited record evidence showing that, nor made a finding of fact

that, either plaintiff was subject to the control of the PRC

government").

As noted above, the Department may only resort to AFA when

it finds that use of facts otherwise available under 19 U.S.C.

---

[6]     Plaintiffs point out that Foshan Shunde had been
granted separate-rate status in a prior review under the Order
and, thus, argue that "when the Department has assigned a
separate rate to a respondent in a prior review, then once the
respondent has certified that its status has not changed, it is
not necessary for that company to resubmit data supporting a
separate rate during subsequent reviews."  Pls.' Mem. 40.  As the
Department correctly explained in the Final Results, however,
"Foshan Shunde's claim that it received a separate rate in a
prior segment of this proceeding and is therefore entitled to one
here" is unavailing because "each segment of the proceeding is
separate with separate administrative records."  Issues & Dec.
Mem. at 5; *see Shandong Huarong Machinery Co. v. United States*,
29 CIT 484, 491 (2005) (not reported in Federal Supplement).

§ 1677e(a) is permitted, and it determines that a respondent has failed to cooperate to the best of its ability. In this case, however, the Department has made no finding that Foshan Shunde's questionnaire responses regarding government control were in any way deficient. In other words, it is not known if there existed a "gap" in the record concerning Foshan Shunde's separate rate status. Because this fact is an antecedent requirement to Commerce's application of AFA, it was contrary to law for the Department to apply AFA to this determination. *See Zhejiang Dunan Hetian Metal Co. v. United States*, No. 09-cv-0217, Slip Op. 2010-1367 at 26 (Fed. Cir. June 22, 2011) ("Commerce first must determine that it is proper to use facts otherwise available before it may apply an adverse inference.").

Similarly, there is no finding that Foshan Shunde failed to act to the best of its ability in responding to the Department's separate-rate questionnaires. Indeed, Commerce acknowledges that its decision to apply AFA in denying Foshan Shunde separate-rate status was based entirely on its finding that the company failed to cooperate to the best of its ability in responding to the Department's questionnaires regarding its factors of production and sales. Issues & Dec. Mem. at 5. Accordingly, Commerce's use of AFA to deny Foshan Shunde separate-rate status is neither lawful nor supported by substantial evidence.

In addition, the record indicates that Commerce did not

notify Foshan Shunde that its questionnaire responses concerning government control were deficient, inform it of the nature of any such deficiency, or provide it with an opportunity to remedy or explain any such deficiency. Section 1677m(d), however, requires that Commerce "shall promptly inform" a respondent of any deficiency in its responses, and "provide that person with an opportunity to remedy or explain the deficiency."[7] *See Mannesmannrohren-Werke AG & Mannesmann Pipe & Steel Corp. v. United States*, 23 C.I.T. 826, 838, 77 F. Supp. 2d 1302, 1313 (1999) ("[B]efore Commerce may use facts available, [section 1677m(d)] requires that Commerce give a party an opportunity to remedy or explain deficiencies in its submission."). Therefore, Commerce's reliance on AFA to deny Foshan Shunde separate-rate status is contrary to law.

CONCLUSION

For the foregoing reasons, the Final Results are sustained in part and remanded. On remand, the Department is to consider evidence on the record concerning Foshan Shunde's independence

---

[7] Although § 1677m(d) only requires that Commerce provide an opportunity to explain any deficiency "when practicable," there is nothing on the record in this proceeding that would indicate that providing this opportunity to Foshan Shunde was impracticable. To the contrary, the Department never made an initial determination as to whether there was a deficiency in Foshan Shunde's submissions concerning government control, but rather, presumed a deficiency based on questionnaire responses concerning factors of production and sales price.

from state control to determine whether the company is entitled to separate-rate status based solely on that evidence.  In addition, if it finds that the record is insufficient to make such a determination, it shall open the record and permit the plaintiffs to place the needed information on the record.  If, upon remand, Commerce determines that Foshan Shunde is entitled to separate-rate status, the Department is to determine an appropriate dumping margin specific to Foshan Shunde, taking into consideration the Department's determination, sustained here, to apply AFA to Foshan Shunde's factors of production and sales data.

The remand results shall be due on February 13, 2012; comments to the remand results shall be due on March 28, 2012; and replies to such comments shall be due on April 12, 2012.

                                        /s/ Richard K. Eaton
                                        Richard K. Eaton

Dated: October 12, 2011
       New York, New York